**Renata v. SHAW, Plaintiff,**

v.

**Daniel J. BOORSTIN, Defendant.**

**Civ. A. No. 77–1379.**

United States District Court,
District of Columbia.

June 16, 1981.

Patricia D. Gurne, Jackson, Campbell & Parkinson, Washington, D. C., for plaintiff.

Lynne K. Zusman, Asst. U. S. Atty., Washington, D. C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, in which plaintiff alleges that she was denied an appointment to the position of Administrative Librarian (Assistant Chief of the Prints and Photographs Division, a division of the Research Department) at the Library of Congress (Library) as a result of discrimination on account of sex. The issue before the Court is whether defendant's application of a one year time-in-grade requirement to this plaintiff resulted in disparate treatment[1] of plaintiff in violation of Title VII.

On September 30, 1976, the Library posted an announcement (Posting 2312) of a vacancy for the position of Administrative Librarian (Assistant Chief of the Prints and Photographs Division). The position was posted as a GS–15 level position, and it required prior service of one year at the GS–14 grade level "or the equivalent." The introductory paragraph of the announcement indicated further that "unless other-

wise indicated, an adequate amount of additional experience or training, as appropriate, may be considered in lieu of qualifications specified."

Plaintiff submitted her written application for the position on October 4, 1976. At that time she was a Bibliographic Specialist[2] at the GS–13/5 level, and she had been an employee in the Prints and Photographs Division for more than fourteen years. Five males and one other female also applied.

John Kuiper, the Chief of the Division and the selecting official, refused to interview plaintiff for the position, claiming an asserted lack of authority to do so because plaintiff had not met the time-in-grade requirement.[3] Dale Haworth, one of the male applicants, was subsequently appointed to the position.[4]

## I

To establish a prima facie case of sex discrimination, plaintiff must show

that she applied for an available position, for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.

*Texas Department of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[5] The government argues that plaintiff was not qualified for the position she sought because she had not met the time-in-grade requirement and that, therefore, she has failed to make a prima facie case. The Court rejects this argument on two bases: first, the position was inappropriately posted as a GS–15;[6] and

---

1. Plaintiff also asserts a disparate impact claim which the Court finds unsupported by the evidence. See note 16 *infra*.

2. This position was created for plaintiff in 1971 by a former Chief of the Prints and Photographs Division, Edgar Breitenbach, and the then Assistant Chief, Alan Fern, an action plaintiff claims to have been designed to remove her from the normal line of promotion.

3. The other female applicant, also a Library employee, was treated similarly.

4. At the time of the trial of this case, Haworth had resigned, and the position had been vacant for one year (and had not been reposted).

5. Plaintiff need not show discriminatory motive in order to establish a prima facie case, *Daye v. Harris,* 24 F.E.P. Cas. 1248 (D.C.Cir.1981); *Aikens v. United States Postal Service,* 642 F.2d 514 (D.C.Cir.1980).

second, even if it was properly posted at that level, the government should have considered plaintiff's experience and training in lieu of that requirement or the requirement should have been waived.

Although there is no direct evidence that the position description was drafted as it was with the specific purpose of discriminating against plaintiff, it is not disputed that (1) plaintiff's supervisors had substantial discretion in preparing position descriptions and in describing the qualifications to be included in the notice of vacancy, and (2) none of the employees in the Prints and Photographs Division occupied a GS–14 position[7] at that time.

The evidence shows that position descriptions are rewritten or revised within the Prints and Photographs Division on the basis of current needs and then sent to the Research Department for review; under the rules and regulations the position description and qualifications for the position of Assistant Chief could have been written so that the position would have been classified at a GS–14 level; and indeed Alan Fern[8] could have requested the Classification Office to set the position up as a GS–14/15 ladder.[9]

None of the government's witnesses acknowledged responsibility for deciding that the position would be written at the GS–15 level. Their explanation for so posting the position was that the Chief's position at the time was a GS–16 and that it was usual to classify the Assistant Chief's position one grade below that. However, at the time of trial, the Library was seeking to fill the position of Chief at the GS–15 level, and the grade level to be assigned to the vacant Assistant Chief's position was undecided— facts which support plaintiff's contention that the requirement of the time in grade at the GS–14 level was a means of eliminating plaintiff from consideration.

Even assuming that the requirement of one year at the GS–14 level "or the equivalent" was job-related, plaintiff's evidence makes it clear that she possessed the requisite equivalent background and experience.

In determining whether an applicant for a position possessed experience equivalent to service for one year at the GS–14 level, the Library refused to consider equivalent federal service, but recognized only service outside the federal government for this purpose. Without deciding the validity of this distinction in the abstract, the Court finds that it was improperly applied here.[10]

The only written document on the subject of time-in-grade requirements[11] was "Basic Positions Qualifications Requirements (To be Used as a Guideline)" dated December, 1968, and published by the Personnel Office. That Guideline contains no prohibition on the application of the "or the equivalent" qualifying experience to Library personnel or experience, nor was there in existence at that time any written Library policy statement to the effect that "or the equivalent" qualifying experience was applicable only to applicants from the outside. In short, the refusal of the Personnel Office, Kuiper, and Fern to consider plaintiff's prior train-

---

6. Had it been classified at the GS–14 level, plaintiff would, of course, have qualified under the strict terms of the announcement. See Part II *infra*.

7. Thus, by requiring experience at the GS–14 level, the appointing authorities effectively precluded all employees within the Division from applying.

8. Fern was Director of the Research Department during the relevant period and, at the time of trial, he was Director of Special Collections and Acting Chief of the Prints and Photographs Division.

9. In fact, a draft of the posting bears the notation "GS–14 or GS–15?"; "GS–14" is crossed out and "GS–15" is circled.

10. Plaintiff's federal employment experience and training was not at all considered by the Personnel Office, Kuiper or Fern (in accordance with the introductory paragraph of the posting). The Personnel Office refused to apply the "or the equivalent" alternative to federal employees except with regard to prior nonfederal employment experience.

11. Indeed, the Library had no written policy in 1976 requiring one year time-in-grade at the next lower level.

ing and experience within the federal government had no basis in general Library policy.[12]

It is also noteworthy that the Library, at the request of the selecting officials, had granted numerous waivers and exceptions to the time-in-grade requirement for Research Department applicants,[13] but, of course, no waiver was granted or even considered here. Significantly, the Library did in 1979 adopt a written policy (LCR–2010–18) regarding time-in-grade requirements, which provides expressly for exceptions to be made in the situation where, as was the case here, there is no position at the intervening grade in the normal line of promotion.

## II

Plaintiff's credentials provide a generous basis for evaluating her application according to the alternatives allowed in the posting or for granting a waiver. She has a Master of Arts degree in art history from the University of Chicago, a Master of Science degree in library sciences from Catholic University, and a Magister Philosophiae degree from the University of Helsinki. She also has graduate degrees in museology and French from European institutions. Plaintiff has exceptional linguistic capabilities and uses seventeen foreign languages in her daily work. She has conducted research and authored numerous publications directly relating to the subject areas encompassed by the Prints and Photographs Division in the field of visual librarianship.[14] It is not disputed that plaintiff is nationally recognized as an authority in the field of pictorial collections. She is well-qualified in both library training and experience and in the subject matter of art history.

By comparison, the successful applicant's credentials were strikingly less impressive. His application showed no professional training, degrees in library science, or previous employment in any library. In addition to Haworth's lack of qualification as a librarian, he lacked the required qualification of competence by training or professional experience to engage in research in the relevant fields. The posting indicated a preference for applicants with scholarly competence in the field of pictorial collections sufficient to merit national recognition as an authority in the field, and a reading ability in French and German. Haworth's application indicated only a fair reading knowledge of German; no speaking, understanding, or writing knowledge of German; and only a fair understanding and speaking ability in French. There is no basis in his application or in subsequent reference checks for concluding that he had scholarly competence in the field of pictorial collections sufficient to merit national recognition.

Further, there are additional "circumstances which give rise to an inference of unlawful discrimination"—there is per-

---

**12.** It was a trainee in the Personnel Office, Rebecca J. Costello, who made the initial determination that Haworth met the qualification of having experience equivalent to one year time-in-grade at GS–14 and that plaintiff did not. Ms. Costello's own testimony established that, by virtue of her training experience, she was not able properly to evaluate the applications for the position of Assistant Chief. It was her position that she would call on recognized authorities to assist her, but she further acknowledged that she did not do so in connection with the present posting. Ms. Costello did consult Tyrone Mason, a Recruitment Specialist in the Personnel Office, regarding the qualifications of both plaintiff and Haworth, but the only standard against which the applications were measured was the posting itself. At the time of plaintiff's application, and continuing to the time of trial, the Library had no written posi-

tion qualification standards comparable to the Civil Service Commission's X–118 Handbook.

**13.** The evidence discloses that two exceptions were made for females, both at lower levels, but at the upper grade levels, exceptions were made only for males. In fact, Fern had himself been promoted from a GS–11 grade to a GS–13 without a year in grade as a GS–12. The Library also admitted that there were no specific criteria and no consistency in granting exceptions or waivers.

**14.** Additionally, she has participated in a leadership capacity in the Special Libraries Association, in a Library Task Force concerned with the agency's reorganization, and in founding the Washington Art Libraries Resource Committee.

suasive evidence that Haworth was prese-lected by Kuiper. Haworth and Kuiper were friends who had known each other since attending graduate school together in the late 1950's. In response to an inquiry in June, 1977, as to how Haworth had heard about the posting, Kuiper replied "I guess through the same professional sort of proce-dures. Word of mouth; you know, it gets around." The Library official charged with making a final decision with regard to plaintiff's discrimination complaint (pursu-ant to which the Equal Opportunity Office concluded that Haworth was preselected) ordered an investigation into the question of preselection. A review of the statements of Haworth and Kuiper during that investi-gation regarding the extent of their con-tacts prior to the official posting of the notice of vacancy reveals several inconsist-encies and evasive or incomplete responses and casts doubt on their credibility.[15] Al-though the notice of vacancy was posted September 8, 1976, the position itself was not certified by the Classification Office until October 18, 1976, the date when Ha-worth was interviewed by Kuiper and when Kuiper hand-delivered Haworth's applica-tion to the Personnel Office—all of this in spite of the fact that the Library requires a position to be certified prior to the posting of the vacancy.

Finally, there is no satisfactory explana-tion for the differences between the 1964 posting for the position of Assistant Chief and the 1976 posting, which was prepared by, or under the direction of, Kuiper. While the 1964 posting included desired qualifications of "knowledge of the organi-zation and administrative procedures of the Library of Congress and the Reference De-partment in particular, as well as LC cata-loging rules and processing procedures" and required qualification of "at least three years of progressively responsible work in a museum or library picture collection," the 1976 posting excluded any requirement of knowledge about Library of Congress or-ganization and procedures or professional experience in a museum or library picture collection. The Court infers from this evi-dence that the 1976 posting was prepared with the purpose of qualifying Haworth for the position.

In short, the evidence strongly suggests that, through one means or another, the Library was determined not to consider plaintiff for appointment to the position of Assistant Chief. It is true that, as defend-ant argues, "when the job clearly requires a high degree of skill . . . , the employer bears a correspondingly lighter burden to show that his employment criteria are job-relat-ed." *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972). Nevertheless, under the circumstances of this case, the Court finds that the requirement of one year time-in-grade at the GS–14 level was not mandatory but was used as an artificial barrier to prevent plaintiff from being in-terviewed and appointed to the position of Assistant Chief of the Prints and Photo-graphs Division. The Court further finds that even if the time-in-grade requirement was job-related, plaintiff met the require-ment through the alternative means provid-ed in the posting.

The Court concludes that plaintiff has carried her burden to establish a prima fa-cie case of discrimination on the basis of sex.

### III

Since 1972, there has been an actual de-cline in the percentages of females in grades GS–14 and GS–15 at the Library. Of eight Division chiefs in the Research Department, seven are male; all six Assist-ant Division Chiefs are male; and all eight super-grade and equivalent positions in the Research Department are held by males. In 1976, the proportion of females was low-

---

**15.** Kuiper conceded that he telephoned Ha-worth and informed him of the vacancy the month before it was posted and he also con-firmed that Haworth and his wife visited and stayed in Kuiper's home while they were in Washington to look for suitable housing, prior to the time Haworth was recommended for the position. Kuiper denied having had any writ-ten communications with Haworth between early 1960 and November 18, 1976, but Ha-worth acknowledged receiving correspondence from Kuiper during that period.

er in the Research Department than for the entire Library at every grade level. Statistical tests of significance applied to three alternative methods to estimate the proportions of females in the relevant labor force resulted in the probability that the difference between the actual proportion and expected proportion of females in grades 14 was due to chance to be less than 1 in 23,000 under one method and less than one in a billion under both of the other methods. The Court takes judicial notice of the fact that the field of librarianship has been predominantly a female profession for many years. Eighty percent of those persons holding Master of Library Science degrees are female; over fifty percent of the persons classified as librarians at the Library of Congress are females; yet, as indicated, almost all of the supervisors at the Library's Research Department were males. Thus, plaintiff's statistical evidence further supports her case.[16]

### IV

In the most recent case in which the Supreme Court has addressed the parties' burdens in a Title VII action, *Texas Department of Community Affairs v. Burdine, supra,* the Court held that once the plaintiff succeeds in proving a prima facie case, the burden then shifts to the defendant to

> rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's

rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant (footnotes omitted). —— U.S. at ——, 101 S.Ct. at 1094.

The Library attempted to justify its treatment of plaintiff by showing that she is domineering, abrupt, and abrasive. However, it presented no evidence that there were any complaints from the public or members of the profession regarding the plaintiff's personality or manner, and it was acknowledged that plaintiff got along well with previous supervisors. Fern, pressed on this matter by the Court, gave vague and evasive responses. Plaintiff's subjective traits were described only by two persons, both of them male supervisors, and their characterization was not otherwise supported by any evidence—circumstances which suggest that plaintiff was the victim of a double standard based on her female sex. With respect to the "domineering character" issue and particularly plaintiff's alleged inability to relate with the public, Breitenbach suggested that he and plaintiff were alike in this respect in many ways, both having difficulty in becoming Americanized, but that characteristic did not operate to keep him from advancing to the Chief's position. In short, the Library's attempted rebuttal evidence not only fails to raise a genuine issue of fact as to whether it discriminated against plaintiff, but it actually supports plaintiff's claim.

In conclusion, the Court finds that there is sufficient evidence in the record from which it may reasonably be inferred that the Library was guilty of disparate treatment of plaintiff in failing to appoint her to the position of Assistant Chief of the Prints and Photographs Division, and that it has failed to rebut plaintiff's prima facie case.[17]

**16.** Defendant's expert conceded that he had made no statistical studies in preparation for his testimony. He did, however, point to sufficient deficiencies in plaintiff's statistics—*e. g.,* small sample size and a variety of plausible explanations other than sex discrimination to account for the disparity between the proportion of women in the Library and their proportion at the upper grade levels—to prevent

plaintiff from prevailing with respect to her disparate impact claim on the basis of the statistics.

**17.** It is also significant that although the Library has been subject to Title VII since 1972 and has, since that time, had a duty to ensure that selection procedures are free of discrimination against protected persons, it had, to the date of trial, adopted no written guidelines on

For these reasons, judgment will be entered in favor of plaintiff and against the defendant.[18]

selection procedures and it had not adopted any written qualification standards. Glen A. Zimmerman, Director of Personnel at the Library, admitted that the Library should have had written guidelines on selection procedures in 1972 when the Library became subject to Title VII.

18. Because the issues of relief (e. g., back pay, retroactive promotion, dates, amounts) and attorneys' fees have not been addressed by the parties in their various pretrial and post-trial memoranda, the parties are being given an opportunity to brief those issues in light of the Court's findings.