Gloria VERDELL, Gladstone S. Lawrence, Bettye Casselberry Vance and Fred Fayerweather, Plaintiffs,

v.

Rear Admiral Donald E. WILSON, as Commanding Officer, Navy Resale System and Supply Office, and John Leyman, as Secretary of the Navy, Defendants.

76 CV 908 (ERN).

United States District Court,
E.D. New York.

March 1, 1985.

Karpatkin, Pollet Perlmutter & Beil, New York City by Marshall Beil, and Jack Greenberg, Judith Reed, New York City, for plaintiffs.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. by Beryl R. Jones, Charles Kleinberg, Asst. U.S. Attys., for defendants.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This is a consolidated action under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e, *et seq.*, brought by four black employees of a federal government agency to redress claimed discrimination in employment based upon race.[1] The Court has jurisdiction over the claims in issue and plaintiffs have exhausted their administrative remedies pursuant to 42 U.S.C. § 2000e–16(c). A trial *de novo* of plaintiffs' respective claims has been conducted and the following findings of fact and conclusions of law constitute the decision of the Court. Rule 52(a), Fed.R.Civ.P.

### FINDINGS OF FACT

Plaintiffs Gloria Verdell, Gladstone S. Lawrence, Bettye Casselberry Vance and Fred Fayerweather are black citizens who were at all relevant times employed by the Navy Resale System and Supply Office (hereinafter "NAVRESSO"), a federal agency within the Department of the Navy. The individual defendants are, respectively, Rear Admiral Donald E. Wilson, the commanding officer of NAVRESSO, and John Lehman, Secretary of the Department of the Navy. Since each plaintiff was employed in a separate activity of NAVRESSO, their respective claims will be considered seriatim.

NAVRESSO, now located at Fort Wadsworth on Staten Island, New York, provides overall supervision of the world-wide operations of the Navy's commissary stores, exchanges, and ships stores, and of the Military Sealift Command exchanges. NAVRESSO's primary functions included providing supervision, technical guidance and administrative assistance to these operations. In fiscal year 1980 it employed more than 30,000 persons worldwide and had sales in excess of $2 billion. The "head office" at Fort Wadsworth is staffed by approximately 800 employees, most of whom, including plaintiffs, are civilians.

*Verdell's Claim*

Plaintiff Gloria Verdell began her employment in the Retail Merchandising Divi-

---

1. The claims were originally certified as a class action but subsequently decertified pursuant to stipulation and order dated July 6, 1982.

sion (RMD) of NAVRESSO in August 1974 as a buyer of women's clothing. She came to that position with 10 years of experience in the retailing field following a year of study at the University of Michigan and two years at the Chamberlain School of Retailing. Among her previous positions, she was a market representative later promoted to assistant buyer at Frederick Atkins (1964–70), a maternity buyer at Alexander's (1970–72), and a market representative (buyer) at May's Merchandising Corporation (1972–74).

Verdell was employed initially at Management Grade 10 under the then applicable NAVRESSO grading system. After a system-wide salary conversion in 1974 to the "Universal Annual" (UA) schedule (conforming to the "GS" schedule used elsewhere in the government), she became a Grade UA–11, where she remained until her resignation on August 6, 1982. Her claim of racial discrimination arises out of the following circumstances.

In May 1975, a vacancy was posted for the position of senior buyer of children's wear in RMD because of the lateral transfer of the incumbent. The position was graded at UA–12 and represented a promotion in salary and managerial responsibility. The only listed qualification for the position was "8–10 years of diversified experience in retailing." Verdell was the only person to submit an application. She was later interviewed by Henry Liebowitz, the branch manager responsible for the children's wear section of RMD, who told her there were additional qualifications, namely, that the person to be selected for her position would be someone with prior children's wear buying experience and "a thorough knowledge of the [NAVRESSO] system." Liebowitz also interviewed three white Grade 11 buyers for the position: Inez Grikitis, Claire Messing and James LoNano, none of whom had submitted applications. Grikitis, who had been a children's wear buyer for some 15 years and a NAVRESSO employee for 10 years, and had worked under the supervision of Liebowitz, was eventually selected for the senior buyer position. In addition to Liebow-

itz's personal interview with each of the buyers named, he had access to their Industrial Relations Department (IRD) employee review profiles. These reflected that only Grikitis was considered "promotable", in contrast to the "not promotable" ratings given Verdell, Messing and LoNano by the senior buyers who were their respective supervisors.

Verdell essentially contends that the selection process for the job for which she alone had applied was a sham designed to ensure that the vacancy would be filled by Liebowitz's preordained candidate Grikitis, a white woman, regardless of qualifications. Although racial discrimination may assume many disguises, the preponderance of the credible evidence in this case does not support a finding that Verdell was denied the sought-after promotion solely because of her race.

Preliminarily it should be noted that the posting of notices of job vacancies by the IRD did not require interested employees to make a formal application in order to be considered, as Verdell had mistakenly thought. Obviously, those already employed as buyers in the children's wear unit where the vacancy occurred were fully aware of the job opportunity and were likely candidates for consideration, as Liebowitz testified. Thus, the Court finds no support for the contention that the interviewing procedure which eventually resulted in the selection of Grikitis was a pretext to disguise race discrimination and eliminate Verdell, an equally qualified black candidate.

The evidence at trial clearly demonstrated that Grikitis possessed far superior qualifications compared to Verdell. As of the time of her promotion to senior buyer Grikitis had been a children's wear buyer at NAVRESSO for over nine years. Prior to that she had twelve years of experience in the retailing of children's wear, during which she had been a buyer of children's wear for some six years. Previously she had been a department manager and assistant buyer at such well-known stores as

Bloomingdale's, Lane's, and Kirby and Block. In contrast to Grikitis' 15 years overall experience as a full-fledged buyer of children's wear, Verdell had no experience in that specialty, her total buying experience of some four years having been limited to the maternity and budget dress areas.

In the important areas of NAVRESSO procedures and operations, Verdell's experience extended over a brief ten months in contrast to Grikitis' nine years. Verdell's single work performance review in 1975, as summarized in Leibowitz's testimony, indicated:

"On Mrs. Verdell's work performance review, it said 'Mrs. Verdell must still further her knowledge of procedures in the areas of procurement', which is buying, 'official correspondence', which is our only way of communicating with exchanges and vendors, 'listings', which is the basis of our entire operation, 'reports', which is required to keep current, and it has 'etcetera'."

Grikitis, on the other hand, as of June 1974—prior to Verdell's employment—had already attained a "very good" rating, the highest a buyer could receive for overall performance. At that time also, she was listed as being "promotable" to the position of senior buyer. In February 1975, she continued her "very good" rating and her record noted that she was promotable to the position of merchandise manager within 18 months, a position even higher than that of senior buyer.

Finally, there is no merit in Verdell's contention that the only requirement for the senior buyer job was "8–10 years experience in retailing." The job description for senior buyer of children's wear included the following: "Procure (*i.e.,* buy) and is responsible for departmental procurement"; "organize and control departmental buying and merchandise plans [for the children's wear department]"; "responsible for management review of the retail operations of Navy Exchanges pertaining to categories [within the children's wear department]"; "prepare reports on current opera-

tions, market trends, pricing"; and "review monthly operations of department." Obviously, these responsibilities which pertained to the special needs of Navy Exchanges scattered all over the globe could best be discharged by a person having the special knowledge and experience which Grikitis had gained over a nine-year period working for NAVRESSO.

■ In a case such as this, "[t]he plaintiff retains the burden of persuasion ... to demonstrate that the proffered reason was not the true reason for the employment decision" not to promote her. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Verdell has failed to satisfy that burden since the preponderance of the credible evidence demonstrates that the determining factor was not Verdell's race but the superior qualifications of a competing candidate.

Accordingly, defendants are entitled to judgment dismissing Verdell's claim.

*Lawrence's Claim*

Lawrence, age 59 and a naturalized citizen, has been employed by NAVRESSO since 1956 when he came to New York from his native Panama, and continues in its employ. His claim in this action is that the higher grade and salary he should have received when he was promoted to Branch Manager in 1974 was denied him because he was black, and that his loss of that title in 1976 was also the result of racial discrimination.

Possessing skills in art and graphics, Lawrence in 1968 became the Supervisor of Graphic Arts, a subdivision of NAVRESSO's Management Operations Section (MO), which embraced a number of support units. In 1974 MO was reorganized, resulting in the formation of a Graphic Arts Branch within the Administrative Services Division of MO. Lawrence was then promoted to the position of Branch Manager. In 1976, however, a further reorganization of NAVRESSO occurred which resulted in new management groupings and changes in supervisory titles. The subdivisions of

the former MO were no longer "branches" but "sections", resulting in Lawrence's title being changed from Branch Manager to Supervisor of three artists then comprising his unit.

Since the completion of trial the issues involved in Lawrence's discrimination claim have been narrowed by virtue of a settlement agreement between the parties. Pursuant to that agreement, dated 9 December 1983, Lawrence's pay scale was retroactively increased as of December 1, 1976 to UA Grade 11 (Step 10) and he received back pay accordingly. That action by NAVRESSO was prompted by a decision of the Equal Employment Opportunity Commission (EEOC) in a separate proceeding brought in 1982 by three female artists who were supervised by Lawrence. The EEOC agreed with their contention that under the Equal Pay Act they had been paid at a lower scale than their male co-worker who had been graded UA–9. NAVRESSO accordingly upgraded the female workers to UA–9 retroactively to September 1, 1976, which in turn required the UA–11 grade increase granted Lawrence pursuant to Civil Service Commission salary classification principles.

The next question is whether the following clause in the December 1983 agreement puts an end to all of Lawrence's discrimination claims in this action:

"This agreement constitutes the full agreement in settlement of the attached EEO complaint of Gladstone S. Lawrence. There are no other agreements between the parties, either expressed or implied, oral or written. Gladstone S. Lawrence agrees to accept the action by NAVRESSO set forth above as full satisfaction settlement of any and all claims allegedly arising from the allegations of discrimination contained in the attached EEO complaint against the United States, the Department of the Navy, NAVRESSO, its employees, its representatives, and Arthur A. La Valle and James W. Simmons. The fact that this settlement agreement has been entered into by NAVRESSO does not constitute an admission by NAVRESSO of the truth of any matter set forth in the attached EEO complaint of Gladstone S. Lawrence, nor does it constitute any admission of liability, fault or error on the part of the United States, the Department of the Navy, NAVRESSO, its employees, its representatives, Arthur A. La Valle, and James W. Simmons. This settlement agreement is the joint product of Gladstone S. Lawrence and NAVRESSO, and it shall not be construed against any party on the ground of sole authorship." (Court Exh. A.)

In a post-trial letter to the Court (Court Exh. B), Lawrence's counsel contends NAVRESSO insisted Lawrence decide immediately whether he would accept the settlement offer without being able to show it to counsel. Although the agreement is dated "9 December 1983", there is no indication as to when Lawrence signed it. However, it was not until December 20, 1983, that he sent a memorandum to Admiral Wilson requesting that his September 1983 EEO appeal regarding "position classification" be cancelled. Court Exh. C. Aside from its declaration that the "settlement agreement is the joint product of" Lawrence and NAVRESSO, the lapse of eleven days before Lawrence withdrew his EEO appeal militates against any inference that his acceptance of its terms was not both informed and voluntary.

Still to be resolved, however, is whether the agreement disposed of all Lawrence's claims in this action. NAVRESSO's counsel in a post-trial letter (Court Exh. D) contends that it did, relying on the provision quoted above. Lawrence's counsel disputes that construction (Court Exh. E), contending that the agreement deals only with so much of his retaliation claim as related to NAVRESSO's failure to classify him upon the retroactive reclassification of his subordinates.

I conclude that the Settlement Agreement (Court Exh. A) must be construed in light of Lawrence's attached EEO complaint referred to in the agreement and his previous memoranda to Admiral Wilson re-

questing cancellation of his belated EEO appeal. Court Exh. C. The latter documents clearly support the conclusion that Lawrence's salary grade grievances dating back to 1976 were to be finally resolved by the retroactive award of the UA–11 (Step 10) grade to December 1976. The nature of this agreed disposition of a salary claim in controversy does not leave it open to the Court to award Lawrence additional back salary to September 1976 (as ordered by the EEOC in the female artists' separate proceeding) or direct NAVRESSO to advance him to UA grade 12, as counsel suggests. As the agreement makes clear, if Lawrence still believes he is not properly graded, he must first pursue available administrative remedies, as he finally did in 1983. See 42 U.S.C. § 2000e–16.

There remains for consideration Lawrence's claim of racial discrimination, which is not embraced within the settlement agreement. That claim is based upon his loss of title as "Branch Manager", which resulted from NAVRESSO's internal reorganization in 1976. Although this was understandably a blow to his sense of self-worth, the preponderant evidence bars a finding of racial motivation.

During the 1974–76 period when Lawrence gained and lost his branch manager title, NAVRESSO was engaged in an effort to conform its grades and salaries to Civil Service classification standards as required by law. The completion of that project necessarily resulted in a re-evaluation of both black and white employees having managerial titles who were not in fact performing executive responsibilities. A number of such employees having branch manager titles were accordingly re-classified as supervisors because they were not involved in overall planning and development functions and could not be considered key decision makers. Thus Lawrence, as previously noted, was downgraded in title because

he was essentially a supervisory artist who performed graphic arts work himself and also directed the work of three assistant artists who comprised his Graphic Arts section, which was but one of several within the newly reorganized Administrative Services Branch.[2] In no sense did Lawrence perform executive responsibilities. He simply carried out graphic arts work required by other departments of NAVRESSO. That he contributed useful ideas in the execution of such work by the artists he supervised did not qualify him as an executive.

■ As previously noted, Lawrence has compromised his salary claims. His claim of discrimination based on the NAVRESSO reorganization effort in 1974–1976 period cannot succeed on the evidence adduced. I find that the effort on NAVRESSO's part to properly conform its salary grades and positions according to Civil Service classification requirements was a bona fide effort to comply with the law and not designed to discriminate against Lawrence or other black employees.

There remains for consideration Lawrence's further claim of retaliation against him because he joined as a plaintiff in this lawsuit. He bases that claim on (1) his "demotion" from branch manager to supervisor in the 1976 reorganization of NAVRESSO; (2) his "harassment" in 1981 in the form of a two-week suspension without pay; and (3) NAVRESSO's failure to reclassify and upgrade him during trial after the Equal Employment Opportunity Commission (EEOC) had directed the retroactive upgrading of the two white employees Lawrence supervised. This last contention is no longer in issue in light of the later salary settlement agreement between Lawrence and NAVRESSO previously referred to. The first contention is no longer viable in light of the Court's findings re-

---

**2.** Pursuant to the 1976 reorganization of NAVRESSO, a System Support Group (SSG) was formed consisting of three divisions: Data Processing, Planning, and Management and Administrative Services (MASD). In addition to the Graphic Arts Section, there were four others in

MASD: Office Services, Editorial and Publication Services, Shipping and Receiving, and Requirements Control, each headed by a Supervisor, who prior to the reorganization had been titled a Branch Manager.

garding the bona fides of NAVRESSO's internal reorganization in the 1974–1976 period. Only the second contention requires discussion in view of the undeniable punishment imposed upon Lawrence during the course of this lawsuit.

This action was commenced in early 1976. The events which ultimately led to Lawrence's suspension for two weeks without pay did not surface until April 1980, some four years later. The instigators of the events were not persons in authority at NAVRESSO but two of the artists supervised by Lawrence. Briefly, these employees—who were white—compiled a log of Lawrence's daily activities with exhibits extracted from his waste basket to support their complaint that he was spending substantial workday time on personal arts and travel business and using government supplies and equipment for such purposes. While attending an annual standards of conduct training program, the complaining employees brought this to the attention of naval intelligence investigator, James Whitener, who had urged attendees to call him if they had information about employee misconduct. Whitener advised NAVRESSO management, conducted an investigation and prepared reports. His findings were brought to the attention of Richard Passera, the director of MASD, who discussed the situation with Lawrence's immediate supervisor, Ray Perlmutter, and with other NAVRESSO personnel. Thereafter, Passera suspended Lawrence without pay for 14 days, taking into account the seriousness of the charges, the substantiality of the evidence and Lawrence's 25 years of service without prior offense.

Lawrence's appeal was later denied by Captain Verplaetse, the Director of the System Support Group, who affirmed his suspension after reviewing Whitener's reports, the substantial evidence which the complaining employees had documented, and Lawrence's failure, though requested, to disclose what evidence he would produce to rebut the charges.

■ There is no evidence supporting Lawrence's present contention that his dis-

cipline was prompted by racial animus. Captain Verplaetse testified that under NAVRESSO regulations a hearing was not required for the short suspension imposed and that he had handled five appeals during his tenure as Director of SSG in which hearings were not held, two of the appeals involving black employees and the others were three white employees.

Significant also is the fact that the naval intelligence investigation did not start for more than four years after Lawrence instituted his Title VII claim, and then only after his fellow employees came forward with the documented evidence they had amassed. In light of that evidence Lawrence's supervisors could not ignore his improper behavior, and thus his further claim that his immediate supervisor harassed him by increasing his supervision of Lawrence cannot be considered discriminatory in the circumstances.

Accordingly, Lawrence's claims of retaliation have no merit and are dismissed.

*Vance*

Plaintiff Vance at the time of trial was employed at NAVRESSO's Oakland, California, field office as a personnel management specialist, grade UA–11, in the Industrial Relations Division ("IRD"). She has worked for the United States Government intermittently since 1959, gaining experience in personnel and counseling areas. In 1973 she was first employed by NAVRESSO in Brooklyn as a non-management personnel assistant in IRD. In June 1973 she was promoted to the position of personnel staffing specialist in IRD's Recruitment and Employment Branch (IR3) and assigned NAVRESSO's then salary grade 7 at an annual salary of approximately $10,817.

Vance complains that she was subjected to disparate treatment by NAVRESSO in that her grade and salary were lower than that of white employees in her section who performed similar work. The credible evidence, however, does not support her claim of racial discrimination. Indeed, it reveals that she received the staffing specialist

promotion in 1973 because of her race in order to reduce the ethnic imbalance in IRD, although there were seven other applicants, three of whom were given "serious consideration" for the position. DX 280.[3] As previously noted, Vance's salary was fixed at grade level 7 in accordance with NAVRESSO's then policy. DX 343. It was anticipated that after Vance demonstrated satisfactory performance in the new position, she would be raised to salary grade level 8. DX 280. This was based upon the procedure followed with the previous occupant of the position, Eileen Ryan, a white employee, who had been raised from grade 7 to 8 after holding the position for approximately a year. DX 320.

The evidence clearly demonstrates the reason why Vance, although assigned a salary grade 8 in July 1974, did not receive the same salary increase paid to her predecessor, Ryan, when the latter occupied the position. That reason was the necessity for compliance with Public Law 92–392, 86 Stat. 564 (1972), the Civil Service wage system used by most federal government agencies, which NAVRESSO was required to adopt. Under that system, federal employees doing similar work were to be paid in accordance with the same salary schedule, regardless of the agency employing them. Although NAVRESSO began the task of converting its grade and salary schedule in 1972 for some 30,000 employees scattered around the world, the enormity of the task delayed completion until late 1974. However, any salary increases which resulted from adoption of the system were made retroactive to June 1974.

■ Adoption of the Civil Service wage system eliminated NAVRESSO's previous flexibility in granting salary increases. Pursuant to its Universal Annual Salary Plan (UA System), NAVRESSO was required to fix and increase salaries strictly

in accordance with its 18 major salary grades, and the 10 increments or "steps" within each grade. The methodology for determining those grades—and thereby salaries—is set forth in the Civil Service Commission's Handbook of Occupational Groups and Series of Classes (Handbook). DX 358. Those standards are race and color blind and were the determinants of the UA salary grade and incremental step applicable to Vance's position, which in her case resulted in a Grade 8 Step 3 annual salary of $11,765. It was that change in the salary structure which barred a further grade increase and not the discriminatory reason asserted by Vance.

Under the principles expounded in *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), Vance has failed to show that NAVRESSO's application of the UA salary plan in her case was but a pretext for discrimination, as she claims.[4] Accordingly, her claim of discriminatory treatment is dismissed.

*Fayerweather*

Plaintiff Fayerweather has been a federal government employee since 1948. During a 20-year period of service in the Air Force he attained the rank of Master Sergeant and held a number of demanding supervisory positions requiring managerial experience at Air Force bases in the United States and Japan. These included inventory maintenance, personnel scheduling, personnel evaluation and managing an airmen's club in Japan having a staff of 20 people and gross revenues exceeding $500,000 per month. Also, while serving as supervisor of Mail Order Merchandise Publications, he had responsibility for administration, personnel, historical and data compilation, instruction and policy formulation, non-routine correspondence, form mainte-

---

**3.** "DX" references are to defendants' exhibits in evidence.

**4.** Vance's own expert witness, David Knudsen, did not dispute that her grade 8 would be the proper grade, if her job responsibilities were as described by her supervisor, Peter Peugot. Tr.

of April 20, 1983 at 451–2. Discrimination cannot be founded on a difference of opinion between experts as to job content in the absence of any tangible indication of discriminatory purpose as was the case here.

nance, supply and equipment control, and advance planning logistics.

In November 1973 Fayerweather entered NAVRESSO's employ in Brooklyn as Assistant Public Affairs officer, Management Grade 9. His education at that time consisted of four years of high school. However, during the next six years, while working full-time at NAVRESSO, he attended Pace University at night and obtained a bachelor's degree in business in 1976, and in 1979, a master's degree in public administration from Syracuse University. He also completed managerial courses, including three offered by the American Management Association, one of which dealt with financial management. Also, in 1976 he was selected to attend, and successfully completed, a course in Supervision and Group Performance given by the Civil Service Commission. And in 1977 he was nominated by his NAVRESSO supervisor to participate in an Executive Management Training Program at Penn State University, and later selected by NAVRESSO commanding officers to attend the Middle Management Program offered by the American Management Association, and to serve as a member of the NAVRESSO Management Council and as an Equal Employment Opportunity Counselor.

Fayerweather has also received awards from NAVRESSO for his recommendations concerning the reformulation of its personnel evaluation criteria and its advertising and marketing strategies in relation to EEO goals. He also assumed the additional workload of editing, designing and producing the systemwide monthly NEWS DIGEST Magazine.

Fayerweather's discrimination complaint arises from events occurring in September 1979. At that time he had advanced to Management Analyst grade UA-11. Noting in NAVRESSO's Weekly Bulletin that a vacancy would occur in the position of Director of the Management and Administration Services Division (MASD), a UA-14 salary grade position, Fayerweather applied. He and 13 other applicants were deemed "fully qualified" by the Recruit-

ment and Employment Branch and their personnel files were forwarded to Captain Raymond P. Loftus, the white selecting official. Loftus had designed a personnel jacket evaluation sheet to evaluate the jackets on a numerical basis, employing six categories on a scale of "3" to "0". Eighteen points was the highest score a jacket could receive. Fayerweather's jacket was ranked first with 14 points, tieing that of Richard Passera, a white applicant eventually selected for the position.

To determine the best qualified candidate, Loftus had convened a panel consisting of himself, Nicholas Risucci, the departing MASD Director, and Joe Ortiz, a representative from the Equal Opportunity Division, to interview the 14 qualified applicants. Neither Risucci nor Ortiz were black. Risucci was chosen to serve as "technical" advisor on the panel. Each applicant was examined orally based upon a questionnaire developed by Loftus containing 18 questions which were assigned values from 1 to 5 per question. Thus each candidate's answer could receive a rating ranging from "1" (poor) to "5" (excellent). The points awarded were derived by multiplication of the value and the rating, with the highest possible score being 390 points. Loftus conceded that such a test had not been used in prior or subsequent selections. Tr. 1106.

After the interviews Fayerweather and Passera received the following scores and rankings:

| Interviewer | Fayerweather | Passera |
|---|---|---|
| Loftus | 285(7) | 312(2) |
| Risucci | 256(5) | 249(6) |
| Ortiz | 262(5) | 275(3) |

Fayerweather contends in substance that the questionnaire selection procedure adopted by Loftus was but a device to conceal the latter's predetermined decision to award Passera the MASD directorship. Fayerweather points out that previously an employee's jacket evaluation together with his past experience had been considered the truly objective measure of his qualifications. As noted above, 18 points was the highest score a jacket could receive. Fay-

erweather's jacket score was ranked first with 14 points and was tied with that of Passera, who was then Branch Manager of the Analysis and Budgets Branch, a grade 13 position. Fayerweather points out, however, that his ranking would have been much higher had Loftus not given him the lowest possible score of "1" for "Outside Related Experience," completely ignoring the extensive experience Fayerweather had acquired in the areas of financial, personnel and inventory management during his 20 years of service in the United States Air Force.

■ Defendants concede that Fayerweather made out a prima facie case of racial discrimination as defined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). As a member of a protected class who applied for a promotion, who met the qualifications for the job he applied for, and who was rejected for the promotion, which was given to a person not a member of the protected class, Fayerweather made out a case of disparate treatment under Title VII. *Burdine, supra,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95; *Acosta v. University of District of Columbia,* 528 F.Supp. 1215, 1222 (D.D.C. 1981). The burden was then on defendants to come forward with a legitimate, non-discriminatory reason for their action. Defendants contend that Passera was better qualified than Fayerweather and that discrimination played no part in his rejection. The preponderance of the credible evidence, however, does not support their contention.

The Court finds that the *ad hoc* questionnaire technique devised by Loftus (and never used before or after) was designed to assure that a white candidate, Passera, would emerge the front runner. That plan encountered difficulty, however, when Fayerweather's jacket score tied Passera's and Risucci, the retiring MASD director, gave Fayerweather a higher score than he gave Passera, and also ranked him ahead of

Passera. Risucci's opinion, as defendants acknowledge, Def. Br. at 74–75, was important, hence his rating of Fayerweather's qualifications was entitled to considerable weight. This, however, was not in accord with Loftus' plan. As defendants' brief put it, he "was disappointed by the results of the personnel jacket evaluation ... [since] [m]any of the candidates' scores were quite close and ... did not provide an effect[ive] way to differentiate among" them. Def. Br. at 77. Loftus was disappointed again when his questionnaire innovation did not produce Passera as the clearcut front runner. To achieve that end, he prepared his own "matrix" of the scoring on a numerical basis, which resulted in the elimination of all candidates except four whites, one of whom was Passera, Loftus' inevitable selection for the MASD directorship.

Defendants endeavor to justify this discriminatory procedure by noting that Loftus had to pass it by NAVRESSO's Review Board. That board was composed of two Navy captains, the director of industrial relations and the deputy Equal Employment Opportunity officer, all white persons. Not surprisingly, the Review Board accepted Loftus' presentation of his reasons for selecting Passera. And although the EEO officer questioned Loftus about his consideration of minority candidates, he made no inquiry as to why the Review Board did not request Risucci, the retiring incumbent, to appear and explain his rating preference for Fayerweather.

By any standard Fayerweather was as well qualified for the MASD position as Passera. He was denied that promotion by an invalid testing procedure that the selecting official had not employed before or after the MASD vacancy. Captain Loftus had no training in psychology, testing or personnel selection, and the questionnaire he employed was not modeled on any examination approved by psychologists or other academics. No specific guidance was provided to the interviewers, and the answer sheet he prepared gave them little guidance, and was often confusing or wrong.

Thus, for questions 10 and 13, two of three possible responses were deemed "correct", even though those responses differed markedly. The problem of standardless discretion was compounded by failure to provide the interviewers with guidelines as to what value was to be assigned to a response.

For example, Loftus testified that the first nine questions were designed to elicit the candidate's professional qualifications and knowledge of the MASD. Yet that had already been determined by the jacket ratings. Moreover, Loftus admitted that it was unnecessary for the director to have detailed knowledge of MASD functions, because he would be able to rely on highly skilled managers. Questions 10 through 16 were "designed to determine how the candidate is thinking", a clearly intangible characteristic. Question 17 sought to evaluate a candidate's "attitude and contribution to the EEO program", by asking him to define "equal employment opportunity", "affirmative action", and "upward mobility", and question 18 asked for "specific actions" taken to show support in those areas. Curiously, Captain Loftus awarded Passera five more points than Fayerweather in this category even though the latter's personnel jacket contained substantial evidence of his EEO participation and contributions, whereas Passera's personnel jacket contained no reference to EEO contributions.

A further illustration of the standardless discretion inherent in the Loftus questionnaire is found in question 9 regarding inventory management experience. Risucci, the retiring MASD director, awarded Fayerweather and Passera 3 of 5 possible points, whereas Loftus gave Passera 4 and Fayerweather only 1. Yet there was scant evidence in Passera's jacket of his having performed jobs entailing inventory management, in sharp contrast to Fayerweather's extensive experience in that area. Loftus was well aware of this because he had reviewed the personnel jackets prior to the interviews.

Finally, the evidence is compelling that the convening of a panel had as its only purpose to lend the appearance of objectivity to a highly subjective procedure and thus provide a vehicle for the non-selection of a superior black candidate. That Fayerweather was well qualified for the promotion is beyond cavil. In five and a half years he had moved upward from Assistant Public Affairs Officer, Management Grade 9, to Management Planning Analyst, Grade 11, in the Management Planning Branch. In that position he was charged with making policy and management recommendations after analyzing sales figures and performance data. He also aided in preparing the testimony of NAVRESSO's Commanding Officer before the House of Representatives Armed Services Committee, which entailed research into NAVRESSO budgetary matters, specifically the utilization of non-appropriated funds. He had consistently been viewed as "excellent" and "outstanding" by his supervisors, and senior management officials have praised him for his "skill as a manager, diplomat, and professional," for his initiative and creativity, and for his very significant contributions to NAVRESSO.

That Fayerweather was the victim of a prejudiced official is evident. In adopting his panel procedure, Loftus disregarded NAVRESSO's instruction that a selecting official either not sit on the panel or act as a non-voting member. Obviously the purpose of such a rule is to insure objectivity in the interviewing process. Moreover, in disregarding Risucci's ranking of Fayerweather ahead of Passera, Loftus ignored the only panel member to have firsthand knowledge of the job in issue, and who had been included on the panel for his technical expertise. Indeed, Passera was not ranked first by any panel member including Loftus.

Furthermore, there is evidence that "preselection" occurred. Loftus testified he did not know Fayerweather "very well" but did know that Passera was in the financial management division. Thus his determination that the next director have proven budgetary skills—a requirement not at all

emphasized or detailed in the NAVRESSO position description—was made with Passera's experience in mind. Furthermore, Loftus developed his own qualification list despite an official list already existing, after 14 candidates were found to meet those qualifications. The qualification list developed by NAVRESSO's Industrial Relations Division treats budgetary and inventory management experience as merely two of ten desired abilities. Those factors were emphasized only in Loftus' list.

Finally, it is apparent that Loftus had determined he would make his selection from the top four white candidates, knowing that such limitation, combined with the test, eliminated all three qualified minority candidates, thereby continuing the underrepresentation of minorities at the UA–14 level. The NAVRESSO Review Board, in approving the selection, acted without careful review of the selection process or the test, and was not informed that a minority candidate had been ranked first, since it had before it only the personnel jackets of the top four candidates. Moreover, the Review Board presumably was unaware that where Loftus has been the selecting official and candidate pools included black persons, he had never selected a black candidate. Additionally, despite specific instructions to be followed for promotions and the Affirmative Action Policy, he testified that there were no "specific procedures", and later admitted that he ignored EEO directives.

Viewed as a whole, the actions of defendants support a finding of discrimination against Fayerweather.

### Conclusions of Law

As the Supreme Court pointed out in *Aikens, supra,* a plaintiff is not required as part of his prima facie case to show that he was more qualified than the person selected, only that he possessed minimum qualifications and that despite his qualifications, the employer selected a nonminority applicant.

The burden of establishing a prima facie case of disparate treatment is not an oner-ous one. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. This Court holds that Fayerweather established a prima facie case of discrimination. Plaintiff is a black male who has established that he was qualified for the position of MASD Director, that despite his qualifications he was rejected and a white male, Passera, was selected for the position. *See Page v. Bolger,* 645 F.2d 227, 229–30 (4th Cir.) (*en banc*), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

■ Once a prima facie case of discrimination has been established, the burden shifts to the defendant to articulate, through admissible evidence, a legitimate, non-discriminatory reason for the employment action. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 193. While the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," *id.,* the prima facie case creates a presumption that discrimination has occurred. Plaintiff may meet the ultimate burden by the introduction of direct or circumstantial evidence, he is not required to submit direct evidence of discriminatory intent. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977); *Lieberman v. Gant,* 630 F.2d 60, 63 n. 2 (2d Cir.1980).

■ If defendant carries its burden, plaintiff must then be given an opportunity to prove by a preponderance of the evidence that the reasons offered by defendant are merely a "pretext" for discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). The plaintiff may show pretext by proving that "a discriminatory reason more likely motivated the employer or ... that the employer's profferred explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; citing *McDonnell Douglas,* 411 U.S. at 804–805, 93 S.Ct. at 1825–1826; *Lieberman,* 630 F.2d at 65.

Defendants attempted to meet their burden principally through testimony of the selecting official, who stated that he simply viewed the selectee as more qualified than plaintiff, based primarily on the scores he awarded the candidates on an oral examination.

This Court holds that the articulated reason is neither legitimate nor non-discriminatory and, alternatively, that plaintiff has shown that the reasons given were but a pretext for discrimination.

The evidence shows that after the objective qualifications of the candidates were reviewed, plaintiff emerged as a front-runner, tied for first place with the selectee. At that point defendants' affirmative action policy dictated that, because of the admitted underrepresentation of blacks above grade 11, plaintiff should have been selected for the position.

Similarly, the selecting official ignored NAVRESSO guidelines on the composition of panels convened for selection purposes. This Court is of the opinion that where the Federal Government is involved, deviation from internal regulations and procedures cannot form the basis of a legitimate, lawful explanation sufficient to overcome a prima facie case of discrimination. *See Hogan v. Pierce*, 31 FEP Cases, 116, 126 (D.D.C.1983); *Predmore v. Allen*, 407 F.Supp. 1067, 1071 (D.Md.1976). Alternatively, the failure to follow guidelines may be viewed as evidence of pretext. *Page v. Bolger*, 645 F.2d at 231; *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1135 (8th Cir.), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981).

Many courts, including those in this Circuit, have recognized that subjective evaluations "may mask prohibited prejudice." *Sweeney v. Research Foundation*, 711 F.2d 1179, 1185 (2d Cir.1983) (citing *Knight v. Nassau County Civil Service Commission*, 649 F.2d 157, 161 (2d Cir.), *cert. denied*, 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981)); *Crawford v. Western Electric Co.*, 614 F.2d 1300, 1316 (5th Cir.); *rehearing denied en banc*, 620 F.2d 300 (5th Cir.1980); *United States v. N.L. Indus-*

*tries, Inc.*, 479 F.2d 354 (8th Cir.1973); *see also, Davis v. Califano*, 613 F.2d 957, 965 (D.C.Cir.1979). Objective criteria "should be used to the maximum extent possible," *Wells v. Meyers Bakery*, 561 F.2d 1268, 1273 (8th Cir.1977), and a subjective system "must be carefully scrutinized for abuse." *Jenkins v. Caddo-Bossier Ass'n.*, 570 F.2d 1227, 1229 (5th Cir.1978). This potential for abuse is heightened where the evaluator is white, as was the selecting official here. *Paxton v. Union National Bank*, 688 F.2d 552, 563 n. 15 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527, 545–46 (5th Cir.) *rehearing denied en banc*, 618 F.2d 1389 (5th Cir.1980), *cert. denied*, 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981); *see also Page v. Bolger*, 645 F.2d at 230 ("... when ... evaluation is ... subjective and when the evaluators are themselves not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny by the trial judge"); *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830, 838 (D.C.Cir. 1977) (evaluation of intangible qualities of blacks may be made unknowingly against a white stereotype).

Applying these principles to this case, the Court finds there is ample evidence of pretext:

*First,* the selecting official, faced with the likely prospect of having to select Fayerweather on the basis of objective evaluation chose instead to rely solely on a non-validated, oral test, admittedly subjective in nature.

*Second,* the selecting official testified that he did not decide to use the test results until after the jacket review indicated Fayerweather was the best qualified candidate. As the Supreme Court has noted the "sequence of events leading up to the challenged decision" is relevant to a determination of purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

*Third,* during the interview process, a number of the questions asked were of a highly subjective nature, deemed to elicit intangibles by the selecting official's own admission. The procedure had not been validated under the federal guidelines (29 CFR § 1607.14) and supplied a ready "coverup" for the non-selection of a qualified black candidate. *Bell v. Bolger,* 708 F.2d 1312 (8th Cir.1983).

*Fourth,* the selecting official chose to emphasize a particular past experience (budgetary) that he knew prior to making the final selection decision directly corresponded with experience already gained by the selectee, who was not ranked first in the examination results by any panel member and who was ranked sixth by the incumbent. Such circumstances lend support to the possibility of pre-selection. *Shaw v. Boorstin,* 517 F.Supp. 336, 340 (D.D.C. 1981).

*Fifth,* the Court finds that defendants' affirmative action plans and other documents establish that there was a continuing pattern of exclusion of blacks from higher level grades. Nonetheless, the selecting official, who by his own testimony has admittedly never selected a black candidate for any position for which he was the official, and has never either before or after this selection used an oral examination, totally ignored EEO policy. Failure to "live up to [an] affirmative action policy" is relevant to indicating an intent to discriminate. *Taylor v. Teletype Corp.,* 648 F.2d at 1135 n. 14.

*Sixth,* the role played by the selecting official violated the government's guidelines on panels. Deviations from normal procedures are themselves evidence of discrimination. *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564.

*Seventh,* it would appear that the use of a panel was only a sham, since the selecting official relied on only his own "recommendations" and ignored those of the other panel members.

For all the foregoing reasons, the Court finds that plaintiff has met his burden of proof and that he was denied a promotion to Director MASD in 1979 in violation of 42 U.S.C. § 2000e–16. He therefore is entitled to appropriate relief, including a retroactive promotion, backpay and reasonable attorney's fees.

Counsel will submit proposed forms of judgment in conformity with this decision within 30 days of the date hereof.

SO ORDERED.