**Katie JACKSON, Plaintiff,**

v.

**EBASCO SERVICES INCORPORATED, Defendant.**

**No. 83 Civ. 3075 (JES).**

United States District Court, S.D. New York.

May 27, 1986.

---

Katie Jackson, pro se; James I. Meyerson, New York City, on brief and of counsel.

Robert S. Hoshino, Jr., New York City, for defendant; Ross J. Holden, on brief.

SPRIZZO, District Judge.

The following constitutes the Court's findings of fact and conclusions of law on the issue of defendant's liability pursuant to Fed.R.Civ.P. 52.

### FACTS

This action was brought by the plaintiff, Katie Jackson, a black woman, against the defendant, Ebasco Services Incorporated ("Ebasco"), for employment discrimination. The plaintiff initiated this action *pro se.* The trial of this matter was bifurcated, and the liability phase was tried before the Court without a jury. Jurisdiction is invoked pursuant to and under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e through 2000e–17 (1982), and 28 U.S.C. § 1343, in conjunction with the Civil Rights Act of 1866, 42 U.S.C. § 1981. Jurisdiction is conceded.

Ebasco is an engineering corporation engaged in the design and construction of facilities used in the generation of electric power. The plaintiff commenced her employment with Ebasco as a clerk typist on November 18, 1973, and that employment continued until she was laid off on February 12, 1982. *See* Pre-Trial Order ("PTO") at 1, ¶ 5(a); Trial Transcript ("Tr.") at 8–10. She was promoted to the position of Administrative Assistant in the Engineering Services Department (Department 610) in January of 1980. *See* PTO at 2, ¶ 5(g); Tr. at 10. When the plaintiff's employment at Ebasco was terminated, her direct supervisor was Joseph Gueci, the manager of the Engineering Services department. At the time of plaintiff's termination, Gueci was responsible for the overall supervision of three departments in addition to the one in which the plaintiff was employed. *See* PTO at 1, ¶ 5(b).

The reduction in force which led to the plaintiff's termination on February 12, 1982, *see id.* at 1, ¶ 5(c), was instituted as a result of an economic downturn in the construction industry and a decline in the defendant's business. *See id.* at 2, ¶ 5(e); Tr. at 44. Gueci was given instructions to do whatever was required to reduce overhead. *See* Tr. at 44–45. Gueci determined that one Administrative Assistant position could be eliminated. *See id.* at 59. Gueci also decided which Administrative Assistant would be laid off. *See* PTO at 2, ¶ 5(d). Before the plaintiff was terminated, the following employees holding the title of Administrative Assistant were employed in Department 610: two black females (Bouyer and Jackson), two white males (O'Rourke and Tama), and one white female (Tufano). *See id.* at 2, ¶ 5(g).

Personnel records were maintained by Ebasco for its employees. These records included "Personnel Performance Appraisals," by which supervisors evaluated the job performance of each employee. These personnel evaluations are relevant to the issues raised by plaintiff's complaint. The level of performance was rated on a scale of 1 through 5. A rating of "1" is considered exceptional, while a "5" denotes unsatisfactory performance. In November of 1981, the Administrative Assistants in Department 610 received the following overall ratings: Bouyer—3 (performance is effective); O'Rourke—3; Tama—4 (performance is acceptable); Jackson—4; Tufano—3. *See id.* at 2, ¶ 5(h). However, a review of several of these evaluations is necessary to determine whether plaintiff was treated differently from others similarly situated.

The plaintiff's overall performance appraisals during her employment as an Administrative Assistant were as follows: [1]

| Date of Appraisal | Rating |
| --- | --- |
| April 29, 1980 | 2–Performance is frequently outstanding |
| November 20, 1980 | 3–Performance meets overall requirements |
| November 11, 1981 | 4–Performance is acceptable |

Gueci prepared plaintiff's November 11, 1981 evaluation. In the evaluation category entitled "Administrative Support Services Functions," plaintiff received two "3" ratings and two "4" ratings. In the evaluation category entitled "Review of Job Behavior" plaintiff received one "3" rating and three "4" ratings. Plaintiff compiled an unsatisfactory attendance record. However, she received no other unsatisfactory ratings.

At trial, Bouyer testified that plaintiff was knowledgeable in the Administrative Assistant position. *See* Tr. at 120. Bouyer also noted that plaintiff was always willing to help Bouyer and the others in her group. *See id.* at 119. Bouyer stated that she felt uncomfortable assigning clerical tasks to plaintiff because both women held the same job title. *See id.* at 119–120. Bouyer also testified that Ebasco had requested that she sign an affidavit stating that Jackson was not helping out. Bouyer refused to sign the affidavit because it was not true. *See id.* at 120.[2] The Court finds Bouyer's testimony very credible.

Joseph Tama received the following overall performance appraisals from 1980 through 1982:[3]

---

1. All of the information which follows concerning the plaintiff's performance evaluations is located in Plaintiff's Exhibit 1 ("Pl.Ex. 1").

2. A letter written to the Equal Employment Opportunity Commission ("EEOC") by Claudia Rowe, a Corporate Equal Employment Opportunity Representative for Ebasco, contains allegations similar to those in the affidavit Bouyer was asked to sign. The letter states in part:
 "... Ms. Jackson was assigned to help Ms. Bouyer with the Mechanical Engineering Group, but in December 1981 Ms. Bouyer informed Mr. Gueci that she (Ms. Jackson) was not really helping out."
 *See* Pl.Ex. 15 at 3, ¶ 7.
 The Court does not find this allegation to be the truth. In this Court's view, the incredibility of this written statement to the EEOC constitutes relevant, admissible evidence of both pretext and discriminatory intent.

3. All of the information which follows concerning Joseph Tama's performance evaluations is located in Pl.Ex. 2.

| Date of Appraisal | Rating |
|---|---|
| March 21, 1980 | 4–Performance falls short of meeting requirements; improvement should be made before next review |
| March 24, 1981 | 4–Performance is acceptable |
| May 27, 1982 | 3–Performance is effective |

Joseph Tama's evaluation of March 24, 1981 contains an overall rating of "4", with an unsatisfactory performance rating of "5" in the evaluation category entitled "Quality and Quantity of Work." Tama received ratings of "4" in the evaluation categories entitled "Participation/Interface," "Job Knowledge and Application," and "Job Behavior." In the category entitled "Managerial and Supervisory Functions," Tama received one "4" rating and one "5" rating. Finally, Tama compiled an unacceptable absence record and an acceptable lateness record.

In Tama's evaluation of May 27, 1982, Gueci commented that Tama's performance had improved since his last evaluation. The May 27, 1982 evaluation includes an overall rating of "4" in the category entitled "Quality and Quantity of Work," an overall rating of "3" in the category entitled "Participation/Interface," an overall rating of "3" in the category entitled "Job Knowledge and Application" and an overall rating of "3" in the category entitled "Job Behavior." However, on November 1, 1982, less than six months later, Gueci wrote the following in a memorandum to D.J. Dorf concerning Tama's performance:

> I [Gueci] informed him [Tama] that he is not performing at a level adequate for him to meet the requirements for support of the Engineering Services Department. I told him that there are many items/tasks which he has been given responsibility for that are continually delinquent and require additional follow-up on my part to determine their status... I informed him that unless an improve-

ment is made in his performance in the near future, I will reassign him to a different position.

Lillian Tufano's "3" rating must be explored by reviewing her performance records from the time she became an Administrative Assistant.[4] On January 5, 1978, Tufano's promotion to the position of Administrative Assistant of the Electrical Engineering Department was announced. However, a form entitled "Employee Potential Evaluation," dated December 12, 1979, stated that due to relocation and the creation of the Engineering Administration Group, Tufano's position would no longer be needed. This form indicates Tufano's desire to work as a receptionist or typist. A form entitled "Employee Development Plan," also dated December 12, 1979, indicates that Tufano desired no further career development. Her supervisor wrote that "she is content to be in her present functional capacity as a receptionist typist."

Tufano received overall ratings of "3" in 1980, 1981 and 1982. Tufano's October 9, 1980 evaluation describes her as "[a] qualified receptionist," who "assists Administrative Assistants when possible." At trial, Gueci testified that Tufano never functioned as an Administrative Assistant while under his direction. See Tr. at 51. On May 24, 1982, Tufano was reclassified from an Administrative Assistant to a Senior Clerk. No change in salary was made.

Brian O'Rourke, who received a "3" rating from Gueci for his overall 1981 performance, see PTO at 2, ¶ 5(h); Pl.Ex. 4, may have received a rating that belied his actual job performance. In a memorandum to the file dated July 2, 1981, Gueci wrote:

> This memo is to confirm my verbal discussions with Brian O'Rourke relative to his excessive lateness as of this date. Brian was informed that if there is no improvement within the next two months on his punctuality, it will be cause for dismissal.

4. All of the information which follows concerning Lillian Tufano's performance is located in

Pl.Ex. 7.

As of the above date, Brian was late 77 times this year. His record for last year indicates that he was late in excess of 50 times.

Brian was informed that this excessive lateness impacts negatively on the working of the group and will be cause for dismissal unless there is a great improvement.

Pl.Ex. 4.

A similar memorandum by Gueci, pertaining to plaintiff's lateness record, and dated July 2, 1981, stated that, "[a]s of the above date, Katie was late 55 times this year. Her record for last year indicates that she was late in excess of 50 times." *See* Pl.Ex. 1. Thus, according to Gueci, as of July 2, 1981, O'Rourke was late 22 times more than plaintiff. In his 1981 evaluation of specific job functions, Gueci gave O'Rourke one rating of "2" for operation "of office equipment applicable to position" —a rating probably reflective of O'Rourke's computer proficiency. *See* Pl.Ex. 15. He also received three ratings of "3", and five ratings of "4". *See* Pl.Ex. 4. Gueci's 1981 evaluation of plaintiff with respect to specific job functions was remarkably similar: three ratings of "3", and five ratings of "4." *See* Pl.Ex. 1.

Even given Ebasco's stated policy that the overall assessment of an employee was to "represent a *composite* [as opposed to a numerical average of specific job function ratings] of [the supervisor's] thoughts and impressions of the person's overall activity in the job," *see, e.g.,* Pl.Ex. 1 (Ebasco's Form 2194/3–81) at ¶ III (emphasis in original), Gueci's rating of O'Rourke as better overall than Jackson is difficult to understand. By Gueci's own account, O'Rourke was late 22 more times than Jackson in the first half of 1981, and received similar specific job function ratings, yet he received an overall rating of "3" to Jackson's "4." This evidence raises an inference that Gueci employed impermissibly subjective and unarticulated standards to judge employee performance. *Cf. Knight v. Nassau County Civil Serv. Comm'n.,* 649 F.2d 157, 161 (2d Cir.), *cert. denied,* 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981).

Barbara Bouyer, on the other hand, compiled a record superior to those of the other Administrative Assistants in 1981. In addition to her overall rating of "3" from Gueci on November 10, 1981, Bouyer's specific job function ratings included one rating of "2," four ratings of "3," and only two ratings of "4." *See* Pl.Ex. 3. Notably absent from her record is any cautionary memorandum of the type included in O'Rourke's and Jackson's files.

Two individuals currently hold the position of Administrative Assistant in Department 610. They are O'Rourke, a white male who assumed his position on May 1, 1980, and Gallo, a white female who assumed the title of Administrative Assistant on May 1, 1983. *See* PTO at 3, ¶ 5(k). However, Gallo began to perform the functions of an Administrative Assistant two months prior to plaintiff's discharge. *See* Tr. at 34, 52, 124. In addition, Anglea Chiusano, who held the title of Senior Clerk, assumed plaintiff's functions after her discharge. *See* Tr. at 58, 59.

On March 22, 1982, the plaintiff filed a charge with the EEOC in the New York District Office. On January 27, 1983, the District Director issued a determination and a Notice of Right to Sue, stating that the EEOC had dismissed the plaintiff's charge due to a lack of reasonable cause. The plaintiff instituted an action in the United States District Court for the Southern District of New York within ninety days of the receipt of the Notice of Right to Sue, as provided by 42 U.S.C. § 2000e–5(f)(1). *See* PTO at 4, ¶ 5(*o*). The liability phase of this case was tried to the Court without a jury.

## DISCUSSION

Title VII prohibits an employer from discharging an employee on the basis of racial considerations. The allocation of each party's burden of proof in a Title VII action is articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to prevail on a Title VII disparate treatment claim, the plaintiff must prove intentional discrimina-

tion. *See Int'l. Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 and n. 15, 97 S.Ct. 1843, 1854–55 and n. 15, 52 L.Ed.2d 396 (1977).

Section 1981 also provides a remedy for racial discrimination in the private employment context. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). Plaintiffs proceeding under § 1981 also must prove discriminatory intent. *See generally General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Accordingly, the criteria developed in *McDonnell Douglas* have been held to apply to cases brought under § 1981. *See, e.g., Hudson v. IBM,* 620 F.2d 351, 354 (2d Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Baldwin v. Birmingham Board of Education,* 648 F.2d 950, 955 (5th Cir.1981). Therefore, the Court will analyze both claims using the framework set out in *McDonnell Douglas.*

*McDonnell Douglas* held that a plaintiff may establish a *prima facie* case of racial discrimination by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*See McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.

Once the complainant has established a *prima facie* case, the burden shifts to the employer to show some legitimate, nondiscriminatory reason for the employee's rejection. The employee must then be given an opportunity to prove that the employer's reason was pretextual. *See McDonnell Douglas, supra,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25.

*McDonnell Douglas* enunciated the elements of a plaintiff's *prima facie* case in the context of discrimination in the hiring process. The Supreme Court noted that varying factual situations will not always make application of the formula practicable in every respect. *See id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. Accordingly, courts have applied the *McDonnell Douglas* formulation in employment termination cases with necessary modifications. *See, e.g., Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281 and n. 3 (7th Cir.1977); *Wade v. New York Telephone Co.,* 500 F.Supp. 1170, 1174 (S.D.N.Y.1980).

In cases where discriminatory discharge is alleged, courts have added the requirement that the plaintiff show he was satisfying the normal requirements of his work, and have permitted the final element of the *prima facie* case to be satisfied by proof that plaintiff was replaced by a non-minority worker. *See Flowers, supra,* 552 F.2d at 1282. If the plaintiff was not replaced, the final element may be satisfied by proof that non-minority workers with comparable backgrounds were retained while plaintiff was terminated. *See Wade, supra,* 500 F.Supp. at 1174. This is the more appropriate inquiry in a case, such as this one, involving reduction in force. *See Deutsch v. Carl Zeiss, Inc.,* 529 F.Supp. 215, 217 (S.D.N.Y.1981).

 Thus, in a case of discriminatory discharge the elements of a *prima facie* case may be summarized as follows: (1) plaintiff was a member of a minority group; (2) she was qualified for the job she was performing; (3) she was satisfying the normal requirements of her work; (4) she was discharged; and (5) after her discharge she was replaced by a non-minority employee, or, if she was not replaced, plaintiff may prove that non-minority workers with comparable work records were retained while she was terminated. *See Said v. Institute of International Education, Inc.,* 29 Empl.Prac.Dec. (CCH) ¶ 32,751, at 25,534 (S.D.N.Y. April 15, 1982) (citing *Flowers, supra,* 552 F.2d at 1282); *Wade, supra,* 500 F.Supp. at 1174; *see also Meiri v. Dacon,* 759 F.2d 989, 996 (2d Cir.) ("the appropriate inquiry should be whether the employer continued to seek applicants to

fill the position"), *cert. denied,* — U.S. —, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

■ Plaintiff is a black woman who was discharged from her position. Plaintiff's supervisor testified that she was performing at an adequate level. *See* Tr. at 105. In addition, all of plaintiff's performance evaluations have been at least acceptable. *See* PTO at 2, ¶ 5(i). Therefore, plaintiff has demonstrated that she was qualified for her job and was satisfying the normal requirements of her work. Proof of competence sufficient to establish a *prima facie* case of discrimination was never intended to encompass proof of superiority or flawless performance. *See Powell v. Syracuse University,* 580 F.2d 1150, 1155 (2d Cir.1978), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1979). Plaintiff satisfied the final element of her *prima facie* case by showing that Joe Tama, Brian O'Rourke, and Lillian Tufano, non-minority workers with comparable records, were retained while she was terminated. *See* Pl. Exs. 1, 2, 4, 7. These facts alone are sufficient to establish that plaintiff has carried her initial burden of establishing a *prima facie* case of employment discrimination.

Therefore, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's termination. *See McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The defendant has arguably satisfied this intermediate burden by explaining that economic conditions mandated that Ebasco reduce its staffing levels, overhead and support activities. *See* PTO at 2, ¶ 5(e); Tr. at 44; Post-Trial Brief of Defendant ("Def.Br.") at 16.[5]

Gueci was given the responsibility of determining how to reduce overhead within his departments. *See* Tr. at 44–45. He determined that one Administrative Assistant position could be eliminated. *See* Tr. at 59; Def.Br. at 17. Gueci stated that his decision to terminate Jackson was based on a review of each individual's performance, record, and worth to the department. *See* Tr. at 60. This is consistent with Ebasco policy, as stated in its response to plaintiff's EEOC complaint, which states that the following factors should be considered in determining a layoff candidate: performance, relative worth/value to departmental needs, productivity, and attendance and punctuality. *See* Pl.Ex. 15.

■ The focus of the factual dispute then becomes whether Gueci's explanation describes the true basis for the employment decision or whether the explanation

---

5. Defendant maintains that, because, of the 14 employees under Gueci's supervision who were laid off in 1982, *see* PTO at 3, ¶ 5(1), "there were eleven Caucasions, one Hispanic, and only one Black employee other than [plaintiff]," *see* Def.Br. at 4, 21, that the record demonstrates a complete lack of discriminatory motivation by Ebasco or Gueci. *See id.* at 21. Defendant also points out that during February of 1982, when Ebasco terminated 97 employees company-wide, *see* Pl.Ex. 8, "there were but 11 Black employees [terminated]," *see* Def.Br. at 4, and that "[t]hese terminations did not have a disproportionate impact on any particular racial group." *See id.* However, while these company-wide statistics may not raise an inference of discrimination on a wholesale, systemic basis, *see* Tr. at 139, they are not dispositive on the issue of whether plaintiff's discharge was motivated by racial considerations, utilizing, as the Court must, the *McDonnell Douglas* framework for making that determination in a disparate treatment—as opposed to a disparate impact—case. Indeed, the Supreme Court has cautioned that general deter-

minations as to the racial composition of a labor force, "while helpful, may not be in and of themselves controlling as to an individualized hiring decision. . . ." *See McDonnell Douglas, supra,* 411 U.S. at 805 n. 19, 93 S.Ct. at 1826 n. 19 (citations omitted).

In any event, the Court does not find defendant's statistical evidence to be sufficiently probative to offset the inference of discrimination in Ms. Jackson's case raised by the evidence recited above. *Cf. Wade, supra,* 500 F.Supp. at 1178. *See also Said, supra,* 29 Empl.Prac.Dec. ¶ 32,751 at 25,536 n. 1, ("In cases where disparate impact is alleged, entirely different concepts of proof arise.") (citing *Teamsters, supra,* 431 U.S. at 335–36 and n. 15, 97 S.Ct. at 1854–55 and n. 15 (1977); *Wade supra,* 500 F.Supp. at 1179).

Finally, on the issue of whether defendant discriminated against plaintiff, the Court does not find persuasive defendant's evidence that, in March of 1982, subsequent to plaintiff's discharge, two of the five individuals under Gueci's supervision who were promoted were black. *See* Tr. at 70, 98–99.

provides simply a pretext for discrimination. *See, e.g., Griffin v. George B. Buck Consulting Actuaries,* 551 F.Supp. 1385, 1389 (S.D.N.Y.1982). The plaintiff may carry her burden of demonstrating that the employer's explanation is pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095. In light of all the evidence presented, the Court finds that plaintiff has established the pretextual nature of the defendant's articulated justification for her termination.

Several factors lead the Court to conclude that Gueci did not actually conduct a comparison of the Administrative Assistants in the manner stated. First, Tama's work record was actually inferior to plaintiff's work record. Tama received two consecutive "4" ratings and was told that his performance was inadequate approximately six months after receiving a "3" rating. *See* Pl.Ex. 2. Despite this inferior performance record, Gueci gave Tama additional responsibilities. Gueci explained this action only by stating "I felt that Joe could do the job... That's an appraisal I make." *See* Tr. at 75.

Secondly, Tufano was retained in the position of Administrative Assistant even though she performed only the duties of a receptionist. *See* Pl.Ex. 7. Gueci justified Tufano's retention by explaining the necessity of the function Tufano performed. *See* Tr. at 92–94. However, by retaining Tufano, Gueci chose to keep as an Administrative Assistant an employee who would perform only the functions of a receptionist. By contrast, Gueci could have retained Jackson, an Administrative Assistant who could perform receptionist functions as well as the functions of an Administrative

Assistant. Therefore, an assessment of each employee's value to the department reflects that Jackson was a more valuable employee than Tufano. These comparisons demonstrate that Jackson was not the logical candidate for discharge. Rather, it establishes that at the very least, Tufano should have been demoted and plaintiff retained as an Administrative Assistant. In fact, subsequent to plaintiff's filing of her EEOC complaint, Tufano was demoted to a Senior Clerk position. *See id.* at 109–11.

Moreover, as discussed above, O'Rourke's employment record was not demonstrably superior to plaintiff's. His record for lateness as of July 2, 1981 eclipsed that of plaintiff,[6] and his ratings for specific job functions were, at best, comparable to those of plaintiff. *Compare* Pl.Ex. 1 *with* Pl.Ex. 4. The Court does not find Ebasco's justification for O'Rourke's retention, primarily on the basis of his proficiency with computers, *see* Pl.Ex. 15 (Ebasco's response, dated May 21, 1982, to Jackson's EEOC complaint) at 3, ¶ 7, to be either persuasive or compelling.

Further doubt is cast on Gueci's explanations by his delegation of Administrative Assistant duties to Mary Gallo two months prior to plaintiff's discharge. *See* Tr. at 34, 52, 123–124. As part of his justification for discharging the plaintiff, Gueci stated that he did not need all of the Administrative Assistants he currently employed. *See* Tr. at 59. However, rather than delegating work to an Administrative Assistant he currently employed, Gueci chose to give these duties to Gallo, a Senior Clerk. At trial, Gueci tried to characterize Gallo's duties as more clerical than those of the other Administrative Assistants. *See id.* at 52–54. However, Bouyer's testimony flatly contradicted this characterization. *See id.*

---

**6.** Ebasco's statement to the EEOC that, "with respect to punctuality, Ms. Jackson exceeded her co-workers with a total of 18 days as opposed to Ms. Bouyer with 7 days late, Mr. O'Rourke with 10 days late, and Mr. Tama with 6 days late," *see* Pl.Ex. 15, is difficult to reconcile with Gueci's memoranda concerning the lateness of both O'Rourke and Jackson. The

Court notes that Gueci's November 1981 annual performance appraisals of Jackson, *see* Pl.Ex. 1, and O'Rourke, *see* Pl.Ex. 4, list those employees as having only 18 and 10 days late, respectively. Defendant has proffered no satisfactory explanation for the vast discrepancy between those lateness figures and the ones cited by Gueci in his memoranda dated July 2, 1981.

at 123–24. The Court accepts Bouyer's testimony as credible.

Plaintiff's showing of pretext is further bolstered by Bouyer's testimony. Bouyer testified that she refused to sign an affidavit stating that Jackson was not helping out because it was not true. *See id.* at 120. Bouyer stated that plaintiff was always willing to help with any type of work. Further, when asked whether Jackson was knowledgeable in the Administrative Assistant position, Bouyer responded, "Yes. Even more so than I." *See* Tr. at 120. This testimony not only impairs Gueci's credibility; it also suggests that the "4" rating which plaintiff received from Gueci may not have accurately reflected her performance. Given that Gueci's evaluation was the lowest plaintiff ever received, and appreciably lower than either of plaintiff's 1980 evaluations, there is a strong inference that the low rating of plaintiff was done to provide a stronger justification for the ultimate termination decision by Gueci, who was, after all, charged with the task of staff reduction of plaintiff's department.

### CONCLUSION

For the foregoing reasons, judgment must be entered for plaintiff on the issue of defendant's liability under Title VII and § 1981. All parties will appear at a Pre-Trial Conference on June 20, 1986, at 10:00 a.m., for the purpose of scheduling a trial on the "damages" portion of this action.

It is SO ORDERED.