Samuel RICHARDS, Plaintiff,

v.

**NEW YORK CITY BOARD OF EDU-CATION, Anthony Alvarado, Anthony D'Alessio, Nicholas Borg, and John Manfredi, Defendants.**

No. 83 Civ. 7621 (CBM).

United States District Court,
S.D. New York.

Aug. 24, 1987.

James I. Meyerson, New York City, for plaintiff.

Peter L. Zimroth, Corp. Counsel of the City of New York by Loise S. Horowitz, Antonia Levine, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Plaintiff, a black carpenter employed by the Division of Buildings of the New York City Board of Education, brings this action pursuant to 42 U.S.C. § 2000e–5 and 42 U.S.C. §§ 1981 and 1983. Plaintiff alleges that he was denied promotion to the supervisory title of Foreman of Mechanics for racially discriminatory reasons. Plaintiff also alleges that defendants' reorganization of the Bronx/Manhattan area office of the Division of Buildings was done with an

intent to discriminate against him because he is black. After a bench trial on the issues of both liability and damages, the court finds in plaintiff's favor, and pursuant to Fed.R.Civ.P. 52, makes the following findings of fact and conclusions of law.

*Findings of Fact*

Plaintiff, Samuel Richards, is employed as a carpenter, a skilled trade position, with the Division of School Buildings and Building Maintenance, formerly called the Bureau of Maintenance and Operations. Richards has been employed in this position by the New York City Board of Education since 1964. When Richards was first employed as a carpenter with the Board, there were approximately 130 to 150 carpenters throughout the five boroughs working for the Division of School Buildings. Approximately four of these carpenters, including plaintiff, were black. At the time of plaintiff's initial employment with the Division of Buildings there were similarly few, if not fewer, blacks working in the various other skilled trade job categories within the Division of School Buildings. Throughout the over twenty year period that plaintiff has been employed as a carpenter with the Board of Education, from 1964 to the present, the low number of black individuals in skilled trade positions, including that of carpenter, has remained essentially the same.

A similar extreme underrepresentation of blacks exists in the supervisory positions within the Division of Buildings. The position of Supervisor of Carpenters (formerly called Foreman of Carpenters) supplies a pertinent example. The Supervisor of Carpenters is the immediate supervisor of a group of approximately ten carpenters and earns approximately two or three thousand dollars more a year than the carpenters he oversees. Thus, there are a significant number of these positions within the Department of Buildings. Throughout the time that plaintiff has been employed as a carpenter with the Board of Education, however, no black individual has ever held the position of Supervisor of Carpenters, save for an individual recently appointed as a provisional Supervisor of Carpenters after the institution of plaintiff's legal action. The numbers are similarly dismal among the Supervisor/Foremen for the various other skilled trades.

In the much higher supervisory position of Foreman of Mechanics, a job whose responsibilities include supervising the foremen or supervisors of the various individual skilled trades, organizing work orders throughout a large area, and requisitioning materials, there has never been a black individual. It was plaintiff's unsuccessful application for this position that forms the basis for his lawsuit.

In sum, over the years there has been a notable paucity of black individuals employed by the Division of Buildings at all levels. In the period just prior to the July 1981 incident of which plaintiff complains, although there were perhaps 700 architects, engineers and technical personnel employed overall, fewer than twenty-five of them were blacks or other minorities. In the separate skilled trade area, which included up to 800 positions, including supervisory ones, at any moment in time, there were fewer than twenty blacks, of whom only two held supervisory titles.[1]

It is against this backdrop that the unsuccessful application of Samuel Richards for promotion to Foreman of Mechanics

1. The distressing statistics of minority representation within the Division of Buildings in the period prior to the incident of which plaintiff complains appear to have been a source of concern to the Board of Education itself. In June 1980, when the Building Division's employment figures came to the attention of Lynette Tucker, the Director of the Board's Office of Equal Opportunity, (OEO), she sent a memo to the Executive Director of the Division of Buildings ordering an immediate consultation between a representative of the Division and the OEO. (PX 6) The memo also provided that in the future the Division of Buildings would be required to report and discuss with the OEO all projected staff vacancies prior to making any new appointments, and that the OEO henceforth would assist the Division of Buildings in identifying qualified minority candidates and in setting up workshops for the Divisions' staff "to make them aware of the regulations required in the area of equal opportunity." Notwithstanding this note of concern by the Board's central office, however, the status quo within the Division of Buildings appears to have remained relatively undisturbed.

must be viewed. In 1979 plaintiff had taken a civil service examination to qualify him for the supervisory position of Foreman of Mechanics/Supervisor of Trades (referred to herein as Foreman of Mechanics). The test results were published in August of 1980. Plaintiff placed second on the examination, scoring 83.678, just a point and a half lower than the first ranked individual, a white male named Milton Garberg, who scored 85.122.

A comparison of the qualifications of Milton Garberg and plaintiff reveals that despite the slightly higher rating of Garberg on the examination, plaintiff was clearly better qualified than Garberg to fill the one Foreman of Mechanics position that eventually came open in July 1981. Although Garberg and plaintiff had similar qualifications in terms of age, length of employment with the Board of Education, veteran's status, and job experience in the Division of Buildings (like plaintiff, Garberg held a non-supervisory skilled trade position), plaintiff's educational credentials were notably superior to Garberg's. While Garberg had only a high school diploma, plaintiff Richards had earned a B.A. degree in government and public administration from City College. Plaintiff had also completed a management course for supervisors offered by the Board of Education. In addition, in 1971 plaintiff had received a New York City teaching certificate.[2] Richard's work experience in the Bronx/Manhattan Area of the Division of Buildings, as opposed to Garberg's exclusive background in the Brooklyn/Richmond Area, would also appear to have made plaintiff a preferable candidate for the Bronx/Manhattan Foreman of Mechanics position that was ultimately filled by Garberg.

Milton Garberg was named to the position of Foreman of Mechanics for the Bronx/Manhattan Area in July 1981. The position paid $36,248 in 1981 and by the time of trial in 1986 had risen to $47,565.[3] (PX 17) In addition, Foreman of Mechanics was a highly visible and responsible position, entailing the supervision of hundreds of skilled trade workers and their foremen, and the management of voluminous area-wide work orders and resources. When Garberg was hired there were only five active Foreman of Mechanics positions throughout the city.

When plaintiff Richards learned that Garberg had received the Foreman of Mechanics promotion he filed a complaint with the New York State Division of Human Rights.[4] Plaintiff was angered and humiliated that Garberg had been appointed rather than himself, and because of the appointment's somewhat peculiar circumstances and plaintiff's own superior qualifications, he believed it to have been a product of racial discrimination. Plaintiff's distress was compounded by the disappointment of his family who had expected he would be awarded the promotion. The depth and tenacity of plaintiff's anguish became evident in his subsequent decision to decline the lower level Supervisor of Carpenters position that was offered to him. Among plaintiff's reasons for declining this promotion was his desire to pursue his complaint regarding the Foreman of Mechanics position and eventually to win that job. Plaintiff felt strongly enough about this vindication that he refused to jeopardize his ultimate entitlement to be named Foreman of Mechanics by using up his veteran's credits on the promotion to Supervisor of Carpenters that was within his immediate grasp.

The appointment of Milton Garberg to Foreman of Mechanics in July 1981 occurred at a time when the Division of Buildings was seriously contemplating a reorganization of certain supervisory posi-

**2.** Despite his teaching certificate, salary considerations persuaded plaintiff to continue as a carpenter for the Board of Education rather than move into the classroom.

**3.** This compares to a carpenter's average annual wage of $24,610 in 1981, rising to $32,265 as of the latest contract.

**4.** Plaintiff eventually received a Right to Sue Letter from the EEOC, leading to the initiation of the present litigation.

tions within the skilled trades. Certain of the Division's executives believed that the Foreman of Mechanics title was redundant and should eventually be phased out. Furthermore, the independent consulting firm of Arthur Young had been solicited at considerable expense to recommend a restructuring of the vast work flow within the Division. This resulted in a July 1981 report by the firm recommending a "resource management system." Under the Arthur Young plan the responsibility for processing and monitoring work orders from the hundreds of individual schools within the system, as well as for requisitioning materials, would be taken from a variety of supervisory titles including the Foreman of Mechanics title, and redistributed to a "Resource Planning Team" (RPT) unit. The report also recommended the institution of a RPT pilot project in the Bronx/Manhattan area at a cost of approximately $65,000 to $75,000.

One early effect of the contemplated reorganization was a reduction through attrition in the budgeted number of Foremen of Mechanics positions. Thus, when three Foremen of Mechanics in the Queens area retired in June 1980 and early 1981, their positions were eliminated from the budget. This represented a net reduction of three positions from the eight Foremen of Mechanics positions city-wide that had existed in the previous year's budget. A fourth Foreman of Mechanics from the Bronx/Manhattan area went on salaried leave in July 1981 in anticipation of retirement. In order, however, to maintain a total of five Foreman of Mechanics in active service during the reorganizational transition, additional funding was provided in the budget so that a new individual could be installed in the now vacant Bronx/Manhattan Foreman of Mechanics position. This was the Foreman of Mechanics position for which Milton Garberg was selected over plaintiff in July 1981.

A few months later, in January 1982, the Resource Planning Team pilot project recommended by Arthur Young was initiated in the Bronx/Manhattan area. Following the conclusion of the pilot project, the RPT organizational structure has continued to function in the Bronx/Manhattan area. At least two of the four persons appointed to this RPT unit have been black. The RPT plan has also been implemented in the Queens area, and at the time of trial in 1986, RPT personnel had been selected for the planned implementation in the Brooklyn office. The new RPT structure has resulted in monetary savings to the Division of School Buildings. Furthermore, due to the success of the RPT concept, there have been no further appointments to the position of Foreman of Mechanics since Milton Garberg's appointment in July 1981. The court finds that the implementation of the RPT concept in the Division of Buildings and the concomitant phasing out of the Foreman of Mechanics position since 1980 and 1981 was accomplished without reference to plaintiff and thus, as explained more fully below in the court's conclusions of law, can provide no basis for his complaint of racial discrimination.

The selection of Milton Garberg over Samuel Richards for the final Foreman of Mechanics position that became available in July 1981 is a different matter, however. Especially in light of plaintiff's overall superior qualifications and defendant's glaring disregard of its own affirmative action mandate, the immediate circumstances of this selection supply ample basis for a finding of racial discrimination.

As previously noted, the civil service eligibility list for the position of Foreman of Mechanics from which any appointment to this job was required to be made ranked Milton Garberg and Samuel Richards in the number one and number two slots respectively, about one and a half points apart. Pursuant to New York Civil Service Law § 61, "[a]ppointment or promotion from an eligible list to a position in the competitive class shall be made by the selection of one of the three persons certified by the appropriate civil service commission as standing highest on such eligible list who are willing to accept such appointment or promotion." This is sometimes referred to as the "one in three rule." According to this rule, the appointing authority has discretion to fill a particular job opening with any one of the

three top ranked available persons on the relevant list and is not required to select the person with the highest ranking. The rule does not, however, require the appointing authority to consider anyone below the top ranking individual, but instead permits him to choose freely among the top three should he so desire.

In practice, the appointing authority in the Division of Buildings had only rarely invoked the "one in three rule" to appoint any candidate other than the number one ranked available individual. Despite the court's finding, however, that in the Division of Buildings the highest ranked individual almost invariably received the job, the court does find credible the testimony of Marcus Caines, a former Director of Personnel for the Division, that the appointing authorities were attentive to more subtle opportunities for "manipulating" the lists, for example, by allowing eligibility lists to expire in order to avoid the appointment of certain ranking individuals.

At the time of the appointment of Milton Garberg to the Foreman of Mechanics position in 1981, the New York City Board of Education had in place an internal affirmative action program administered by the Board's Office of Equal Opportunity to encourage greater representation of women and minorities at all levels of employment. (PXs 6, 7, 18, 19) (Equal Employment Opportunity Program memos and guidelines) The Division of Buildings was subject to this program. In contrast to the formal affirmative action program for teaching staff that the Board of Education had instituted after a probable cause finding by the federal Justice Department some time earlier, the affirmative action mandate of the Board's Equal Employment Opportunity Program was not a formal plan in the sense of having goals or quotas. The affirmative action mandate of the EEO Program to which the Division of Buildings was subject was definite and explicit, however.

The main document delineating the EEO plan, Chancellor's Memorandum No. 47, dated May 1, 1980, (PX 19), required the director of each division carefully to review the racial and sexual makeup of his office and, whenever circumstances permitted, to improve the presence of minorities at all levels. Minority representation in supervisory positions was especially emphasized. *See also* PX 7. Directors were instructed to "be specifically sensitive to the opportunities that arise because of transfers, promotions or job openings in [their] office[s]." The EEO plan included guidelines for individual offices providing that each office "should take steps ... to recruit, employ and promote qualified members of groups not visible on their staff." It called on the Executive Director and the Director of each office for "viligant implementation" of the program and "continuous progress in this important area."

According to Marcus Caines, a former Director of Personnel at the Division of Buildings who left that post just prior to Milton Garberg's July 1981 promotion to Foreman of Mechanics, the affirmative action program of the Office of Equal Opportunity was applied only weakly, if at all, by the Buildings Division. This observation is corroborated by the shocking minority employment statistics previously recited herein, as well as by an urgent June 1980 memo from the Board's own Office of Equal Opportunity, *see* note 1, *supra*, calling for the Division of Buildings to take immediate remedial action.[5]

Had there been any serious attempt by the Division of Buildings to comply with the Board's affirmative action mandate, the appointing authority would have invoked the "one in three rule" to appoint Samuel Richards to the Foreman of Mechanics position. The Division's failure in this instance to invoke the rule so that plaintiff might be considered and selected as Foreman of Mechanics was in blatant disregard

---

**5.** The court finds it significant that defendants made no attempt to call as a witness the author of this memo, Lynette Tucker, a current Board employee who in 1980 was Director of the Office of Equal Opportunity. While plaintiff, of course, retains the ultimate burden of proving discrimination, defendants' failure effectively to undermine his evidence of racially discriminatory currents within the Division can only work to increase the force of plaintiff's argument.

of its affirmative action mandate. Thus, when viewed in the larger context of the appointing authority's discretion to choose any one of the top three candidates, the closeness of Garberg's and Richard's examination scores, Richard's overall superior qualifications, the Buildings Division's serious history of racial imbalance, and the affirmative action mandate that the Division chose to disregard, the appointment of number one ranked Milton Garberg to Foreman of Mechanics is far less racially innocuous than defendants pretend.

Other peculiarities of the Garberg appointment support a finding that race played a part in the selection of this individual over plaintiff for the Foreman of Mechanics position. Garberg's appointment was accomplished in a unique manner in that he was never officially interviewed for the position, as was normally the case with appointments off civil service eligibility lists. The Director of Personnel for the Division of Buildings at the time, Marcus Caines, tesified that it was his impression that political cronyism played a role in the appointment. Moreover, Caines, a black individual, did not participate in the discussions leading to the appointment of Garberg, even though he was traditionally involved in such decisions. Instead, the Director of the Division, Anthony D'Alessio, was unusually and personally involved in the decision. Mr. D'Alessio's exceptional direct involvement in Garberg's hiring and his manipulation of the budget to ensure that there would be a replacement position for the Bronx/Manhattan Foreman of Mechanics who retired in July 1981, strongly suggest that political clubhouse considerations and a desire to maintain white hegemony in the Division's lucrative supervisory positions were important factors in the selection of Milton Garberg over Samuel Richards for the promotion at issue in this case.

## CONCLUSIONS OF LAW

Title VII prohibits an employer from discriminating on the basis of race in any employment decision involving hiring, promotion, or discharge. The allocation of each party's burden of proof in a Title VII case has been set forth with great care by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order ultimately to prevail on a Title VII disparate treatment claim, the type of claim at issue in the present case, the plaintiff must succeed in proving intentional discrimination. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 and n. 15, 97 S.Ct. 1843, 1854 and n. 15, 52 L.Ed.2d 396 (1977); *Jackson v. Ebasco Services*, 634 F.Supp. 1565, 1569–70 (S.D.N.Y.1986).

Sections 1981 and 1983 of Title 42 of the United States Code also provide remedies for racial discrimination in employment. *See, e.g., Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975); *Poolaw v. City of Anadarko*, 660 F.2d 459 (10th Cir.1981), *cert. denied* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 779. As with a disparate treatment claim under Title VII, a plaintiff proceeding under Section 1981 or Section 1983 must ultimately prove discriminatory intent. *See generally, General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Krulik v. Board of Education*, 781 F.2d 15, 23 (2d Cir.1986). Accordingly, the criteria developed in the Title VII cases of *McDonnell Douglas* and *Burdine* may also be applied in employment cases brought under Sections 1981 and 1983. *See, e.g., Hudson v. IBM*, 620 F.2d 351, 354 (2d Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Huntley v. Community School Board of Brooklyn*, 543 F.2d 979, 983 n. 6 (2d Cir.1976), *cert. denied* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773.

The basic allocation of evidentiary burdens in an employment discrimination case are as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in

proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 at 252–53, 101 S.Ct. 1089 at 1093, 67 L.Ed.2d 207. (citations omitted).

A plaintiff may meet his initial burden of establishing a *prima facie* case of employment discrimination by showing that he is a member of a protected group, and that he "applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 and n. 13, 93 S.Ct. 1817, 1824 and n. 13, 36 L.Ed.2d 668 (1973) (explaining that the elements of a *prima facie* case giving rise to an inference of discriminatory intent will necessarily vary according to the factual context.)

Once plaintiff has made a *prima facie* case, the burden then shifts to the defendant "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* Once defendant has satisfied this burden of production by introducing evidence of its legitimate reasons for rejecting plaintiff, plaintiff must show, if he is to prevail, that defendant's proffered reason was not the true reason for the employment decision. *Id.* Plaintiff may succeed in meeting this ultimate burden of proving intentional discrimination "either directly by persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095.

■ Although the ultimate burden of proving that the defendant intentionally and illegally discriminated against him remains with the plaintiff at all times, *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, it is important to note that illegal considerations need not have been the sole motivating factor in the employer's decision. Rather, the plaintiff may establish a violation of Title VII by showing that race was at least "a factor—a 'but for' cause—in the decision." *Griffin v. George B. Buck Consulting Actuaries,* 551 F.Supp. 1385, 1389 n. 7 (S.D.N.Y.1982) (citing *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976). Furthermore, direct, smoking gun, evidence of discrimination is clearly not required in order for plaintiff to prevail. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977).

■ Plaintiff in the present case has unquestionably met the minimal burden, *see Sumner v. San Diego Urban League,* 681 F.2d 1140, 1142 (9th Cir.1982); *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 177 (1st Cir.1978), *vacated on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), *aff'd. on remand,* 604 F.2d 106 (1st Cir.1979), of establishing a *prima facie* case of illegal discrimination. Samuel Richards is a black man who applied for an available position as a Foreman of Mechanics. He was qualified for this opening by virtue of his high rank among the top three persons on the civil service eligibility list and by virtue of his superior education and experience. Instead of selecting plaintiff for the promotion, the Division of Buildings, an office with a salient history of racial imbalance at all levels, chose a white individual of arguably lesser qualifications than plaintiff. In these facts alone the court finds sufficient basis for a reasonable inference of discrimination.

█ Defendants, however, have met their rebuttal burden of producing evidence of a legitimate, nondiscriminatory reason for the selection of Milton Garberg, the white individual, over plaintiff. This is simply that Garberg was in fact the top ranking individual on the civil service examination list from which the position was required to be filled.

█ Notwithstanding defendants' protestations of scientific objectivity in appointing Garberg rather than plaintiff to be Foreman of Mechanics, and the court's finding that defendants have provided sufficient evidence to challenge plaintiff's *prima facie* case, the court finds that plaintiff has met his ultimate burden of showing that the "proffered explanation is unworthy of credence," *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, and that race was indeed a significant factor in the decision.

Several factors persuade the court that plaintiff Richard's failure to obtain the promotion was not merely a matter of racially neutral arithmetical destiny. For one thing, Garberg's top ranking on the civil service list was clearly not as dispositive as defendants suggest, for the well known "one in three rule" made Richards equally eligible for the promotion. This being the case, the far superior educational qualifications of plaintiff and his long experience in the Bronx/Manhattan area where the new Foreman of Mechanics was to operate make the appointment of Garberg suspect.

Defendants' general failure over the years to comply with affirmative action directives, and their particular failure to do so in plaintiff's case, provides further evidence of defendants' hostility to minority employment and advancement and to plaintiff's application. Plaintiff's candidacy for Foreman of Mechanics was not merely an opportunity for promoting racial equality that defendants would have done well to consider, it was an opportunity that their own affirmative action plan required them to consider and to pursue. While defendants' failure to pursue this opportunity, i.e., to promote Richards by invoking the "one in three rule" in conjunction with the affirmative action plan, may not by itself provide sufficient evidence for an ultimate finding of illegal discrimination in this case, *but see Jones v. Cleland,* 466 F.Supp. 34, 37–38 (N.D.Ala.1979) (nonfeasance of affirmative action plan compels finding of discrimination), common sense dictates that defendants' disregard of these guidelines is important evidence of pretext and discriminatory intent. *See also Verdell v. Wilson,* 602 F.Supp. 1427, 1439–40 (E.D.N.Y.1985); *cf. White v. Vathally,* 570 F.Supp. 1431, 1435 (D.Mass.1983), *aff'd.* 732 F.2d 1037 (1st Cir.1984), *cert. denied* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267. Defendants' contention that it would have been illegal reverse discrimination for the Division to have preferred Richards to Garberg pursuant to the affirmative action mandate is utterly without merit. *See Johnson v. Santa Clara County Transportation Agency,* —— U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (upholding the legality of voluntary affirmative action plans which seek to redress racial and sexual imbalances in the workforce by encouraging the consideration of minority or protected group status in employment decisions).

Finally, certain unorthodox features of Garberg's appointment to Foreman of Mechanics make it impossible to give full credence to defendants' explanation that the reason Garberg got the promotion over Richards was simply that Garberg scored slightly higher on the civil service exam. The scent of political patronage that surrounded Garberg's appointment, the circumvention of ordinary interview processes, and the fact that the appointment was never discussed with the Division's black personnel director, all suggest that the appointment was somewhat less innocent than defendants contend, both racially and otherwise. These circumstances, together with the historical and persistent absence of blacks in the Division's supervisory and other positions, render it more than unlikely that plaintiff would have been promoted to Foreman of Mechanics in July 1981 even if he had ranked ahead of Garberg on the list.

The court does not mean to suggest that race was the sole factor in the decision to promote Garberg instead of plaintiff.

Without exploring the possible racial overtones of political clubhouse affiliations, it seems evident that Garberg's career in the Division of Buildings was not hurt by his "connections," and that as much as race, these were a factor in his promotion. It is not necessary, however, to show that race was the sole factor. Because the court finds and concludes that race was a deciding and intentional factor in defendants' appointment of Milton Garberg rather than Samuel Richards to the position of Forman of Mechanics, the court awards plaintiff monetary and injunctive relief pursuant to 42 U.S.C. §§ 1981, 1983,[6] and 2000e *et seq.*

Accordingly, plaintiff is granted an equitable award of back pay from July 1981 to the present. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (back pay award for employment discrimination under Section 1981 is not restricted to the two year limit specified in 42 U.S.C. § 2000e–5(g) for back pay awards under Title VII). This award shall consist of the difference in salary and benefits between what plaintiff actually earned as a carpenter for the Division of Buildings during this period and what he would have earned had he been appointed to the Foreman of Mechanics position. In addition, plaintiff is also awarded compensatory damages of $15,000 on his claim for emotional distress under 42 U.S.C. §§ 1981 and 1983. *See McCoy v. Goldin*, 598 F.Supp. 310, 316 (S.D.N.Y. 1984); *Thomas v. Resort Health Related Facility*, 539 F.Supp. 630, 633 (E.D.N.Y. 1982).

In order to make plaintiff whole, the court also orders defendants to promote Richards to the next Foreman of Mechanics position that becomes vacant,[7] or to the next available position of commensurate responsibility and pay in the Division of Buildings for which plaintiff is qualified. In light of the massive size and workload of this Division, the court expects that such a position should become available within the next six months.

As a final matter, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e–5(k) plaintiff is awarded reasonable attorneys fees as the prevailing party in this action.

*Conclusion*

The court finds and concludes that plaintiff has sustained his burden of proving by a fair preponderance of the credible evidence that his failure to obtain a desired promotion was a product of racial discrimination. Accordingly, plaintiff is awarded back pay, compensatory damages, injunctive relief, and attorneys fees.

---

6. In his Section 1983 claim plaintiff has clearly met the burden under *Monell v. Department of Social Services*, 436 U.S. 658, 690–92, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978) of showing a custom, policy, or practice of discrimination by the Board of Education. He has done this by demonstrating that the employment decision of which he complains was performed by an official having final authority. *Krulik v. Board of Education of City of New York*, 781 F.2d 15, 23 (2d Cir.1986); *Rookard v. Health and Hospitals Corp.*, 710 F.2d 41, 45 (2d Cir.1983).

7. Although the position of Foreman of Mechanics is in the long-term process of being phased out by the Division of Buildings, the fact that individuals continue to function in this position persuades the court that there is ample work within the Division to keep a Foreman of Mechanics occupied. Thus, despite the planned phase-out, it would not be unreasonable for defendants to retain the next vacant Foreman of Mechanics slot and appoint plaintiff thereto.